663 F.2d 223
 106 L.R.R.M. (BNA) 2187, 214 U.S.App.D.C. 46,
90 Lab.Cas. P 12,478
 AMALGAMATED MEAT CUTTERS & BUTCHER WORKMEN OF NORTH AMERICA,
AFL-CIO, LOCAL 576, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Sam & Ed's, Inc., Clinton Foods, Inc., Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CLINTON FOODS, INC., a/k/a Morton's IGA Foodliner, Respondent.
 Nos. 79-1297, 79-1434.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 12, 1980.
Decided Dec. 31, 1980.
 
 Richard B. Thompson and Richard Roesel, Washington, D. C., a member of the bar of the District of Columbia, pro hac vice by special leave of Court, with whom Robert L. Uhlig, Kansas City, Mo., was on the brief, for petitioners in No. 79-1297. Robert L. Kimbrough, Topeka, Kan., also entered an appearance for petitioners in No. 79-1297.
 Michael F. Messitte, Atty., N. L. R. B., Washington, D. C., a member of the bar of the Supreme Court of Maryland, pro hac vice by special leave of Court, with whom John S. Irving, Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief, for respondents in No. 79-1297 and petitioners in No. 79-1434.
 Stephen P. Dees, Chicago, Ill., with whom Alvin D. Shapiro, Kansas City, Mo., was on the brief, for intervenor, Sam & Ed's, Inc., in No. 79-1297.
 Stanley E. Craven, Kansas City, Mo., a member of the bar of the Supreme Court of Missouri, pro hac vice by special leave of Court, with whom Harry L. Brown was on the brief, for intervenor, Clinton's Foods, Inc., in No. 79-1297.
 Before McGOWAN, TAMM and ROBB, Circuit Judges.
 Opinion for the court filed by Circuit Judge ROBB.
 ROBB, Circuit Judge:
 
 
 1
 This case arises out of the May 1977 closing of a supermarket operated by Clinton Foods, Inc. in Clinton, Missouri. One month after the closing another supermarket operated by Sam & Ed's, Inc., opened on the same premises. The Amalgamated Meat Cutters and the Retail Store Employees Union contend that Sam & Ed's is the alter ego of Clinton Foods and that both corporations have violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1976)[1], by refusing to honor the collective bargaining agreements in force between these unions and Clinton Foods.
 
 
 2
 Both unions filed unfair labor practice charges with the National Labor Relations Board. The Board's Regional Director issued a complaint and a hearing was held before an Administrative Law Judge (ALJ) on November 21 and 22, 1977. The ALJ concluded that Clinton Foods and Sam & Ed's were not alter egos, but that Clinton Foods had violated section 8(a)(5) by failing to notify the unions that it was going out of business and failing to bargain with them concerning the effects of the closing. He recommended that the charges growing out of the alter ego allegation be dismissed, but that Clinton Foods be ordered to bargain with the unions over the effects of its closing and that it be required to pay each union member at least two weeks' back wages.
 
 
 3
 A three-member panel of the National Labor Relations Board adopted the ALJ's recommended decision, with one member dissenting in part on the alter ego issue. Clinton Foods, Inc., 240 NLRB No. 179 (1979). The case is now before us on the unions' petition for review of the dismissal of the alter ego allegations (No. 79-1297) and the Board's cross-application for enforcement of its bargaining and back pay order (No. 79-1434).
 
 
 4
 The underlying facts are not disputed. Prior to September 1973, the store in question was leased and operated by Wetterau Foods, Inc., which also operated a food wholesaling business in Missouri. The store was known as Morton's I.G.A., and Sam Morton was employed there as store manager. In September 1973 Wetterau sold the business to Clinton Foods, which had been organized for the purpose of operating this store. Wetterau subleased the building to Clinton Foods and sold it all the store's assets.
 
 
 5
 Morton owned approximately 18% of the shares of Clinton Foods. The remaining 82% were owned by Blackburn Foods, Inc., a corporation whose shares were owned by five other persons (the Blackburn group). Morton paid $15,000 for his interest in Clinton Foods, obtaining the money from a bank loan which was co-signed by his wife and the five members of the Blackburn group. Morton was elected president of Clinton Foods and continued as manager of the store, which still was known as Morton's I.G.A. He was responsible for the day to day operation of the store and for its labor relations, including the negotiation of collective bargaining agreements and the hiring, scheduling, disciplining, and firing of employees. The members of the Blackburn group were all elected directors of Clinton Foods, but they occupied no other position with the store.
 
 
 6
 Clinton Foods had entered into collective bargaining agreements with Local 576 of the Amalgamated Meat Cutters covering the employees in its meat department, and agreements with Local 782 of the Retail Store Employees Union covering employees who handled and sold merchandise. The most recent contract with the Meat Cutters extended from November 7, 1976 to November 4, 1978; the most recent Store Employees' contract extended from September 1, 1974 to November 12, 1977.
 
 
 7
 The store operated at a loss from September 1973. In late 1976 and early 1977 the losses increased and the Blackburn group decided to close the store. Several of them met with Morton in April 1977 and informed him of their decision. Morton testified that he felt he had to go along with the decision because he was only a minority shareholder in Clinton Foods. Morton discharged most of the store's employees (and all the unionized ones) on April 30, 1977 and closed the store on May 14.
 
 
 8
 The ALJ credited the testimony of several employees who said that on many occasions before the store closed Morton had blamed high union wages for the losses it was suffering and had said that the store would have to close because of this.
 
 
 9
 Because Morton wanted to continue operating the store, the Blackburn group agreed to sell it to him if he could raise the money. Morton interested his friend Ed Young, an experienced meat cutter and meat market manager, in buying the store. He also received financial assistance from his father-in-law, Jack Payne. The three men were able to obtain a bank loan of $155,000, secured by mortgages on their homes and on a farm owned by Payne. They then incorporated Sam & Ed's, Inc., with Morton and Young each owning 300 shares and Payne owning 400 shares. Payne participated solely as a financial backer, however. The parties planned that his shares would revert to the corporation when the bank loan was paid, making Morton and Young each an owner of 50% of the corporation.
 
 
 10
 The parties eventually agreed upon a purchase price of approximately $99,000 for the assets of the store. Clinton Foods agreed to be liable for the store's outstanding debts, and the Blackburn group agreed to pay the remaining balance of Morton's $15,000 note (about $12,400). Clinton Foods assigned its sublease on the store to Sam & Ed's, but remained liable upon it.
 
 
 11
 The store reopened on June 14, under the name Sam & Ed's, I.G.A. Morton's duties in Sam & Ed's remained basically the same as his previous duties with Clinton Foods. He was still store manager and still in charge of labor relations. Young became the manager of the meat department. Although Morton rehired some of the supervisors who had worked in the store, he did not offer employment to any of the employees who had been members of the unions.
 
 
 12
 The unions contend that Sam & Ed's is the alter ego or "disguised continuance" of Clinton Foods. Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942). They therefore argue that Sam & Ed's shares the obligation imposed upon Clinton Foods by section 8(a)(5) to bargain collectively with them. They say that after the store reopened Clinton Foods and Sam & Ed's violated section 8(a)(5) by refusing to bargain with them and by unilaterally altering the terms and conditions of employment.[2] The Board found, however, that the two companies are not alter egos and that Sam & Ed's is therefore not obligated to bargain with the unions.
 
 
 13
 The Supreme Court has stated that in an alter ego situation there is "a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances the courts have had little difficulty holding that the successor is in reality the same employer and is subject to the legal and contractual obligations of the predecessor." Howard Johnson Co. v. Hotel & Restaurant Employees, 417 U.S. 249, 259 n.5, 94 S.Ct. 2236, 2242 n.5, 41 L.Ed.2d 46 (1974). The Board has developed the following standards for deciding whether "the successor is in reality the same employer": "Clearly each case must turn on its own facts, but generally we have found alter ego status where the two enterprises have 'substantially identical' management, business purpose, operation, equipment, customers and supervision, as well as ownership." Crawford Doors Sales Co., 226 NLRB 1144 (1976).
 
 
 14
 The ALJ applied these standards in this case and concluded: "The missing element in the instant case is, of course, ownership." 240 NLRB No. 179 at 6. Because the ownership of Sam & Ed's and Clinton Foods is not "substantially identical", he recommended that the alter ego allegations be dismissed. The Board panel, one member dissenting, adopted this recommendation.
 
 
 15
 The Board's decision is supported by substantial evidence. Morton is the only owner of Clinton Foods who has an interest in Sam & Ed's. Morton's 18% interest in Clinton Foods and his 30% interest in Sam & Ed's (which may become a 50% interest) are insufficient to support a conclusion that Clinton Foods and Sam & Ed's share a "substantially identical" ownership. The Blackburn group, who owned 82% of Clinton Foods, has no ownership interest in Sam & Ed's. They receive no income from it and have no authority to make decisions about the operations.[3]
 
 
 16
 The record establishes that the sale of the supermarket was not a "paper transaction without meaningful impact upon the ownership or operation of the enterprise." Howard Johnson Co. v. Hotel & Restaurant Employees, supra at 259 n.5, 94 S.Ct. at 2242 n.5. Rather, the ALJ and the Board majority found on the basis of substantial evidence that this was an arms length transaction in which the owners of a large majority of the shares of Clinton Foods relinquished all their interest in the store. We find no reason to disturb this conclusion and we therefore deny the unions' petition for review.
 
 
 17
 Clinton Foods has refused to obey the Board's order to bargain with the unions over the effects of closing the store and to give the union members two weeks' back pay. This order was based upon the ALJ's finding, affirmed by the Board, that Clinton Foods did not inform the unions of its plans prior to the closing of the store. Clinton Foods objects to this order on two grounds: (1) that it did not receive sufficient notice of the charge; (2) that back pay is an inappropriate remedy in this case. We do not decide whether back pay was a proper remedy, for we find that the notice given to Clinton Foods was inadequate.
 
 
 18
 The only evidence on this issue was elicited during the cross examination of Morton, who had been called as a hostile witness by the attorneys representing the Board's General Counsel. In response to a question from the Meat Cutters' attorney Morton testified (over the objection of Clinton Foods' attorney) that he had not informed the unions that the store would close. (J.A. at 229).
 
 
 19
 After the General Counsel and the unions rested their case, counsel for Clinton Foods moved for dismissal of the complaint on the ground that the evidence failed to show that Clinton Foods and Sam & Ed's were alter egos. The ALJ then asked General Counsel's attorneys if they were relying upon any theory as an alternative to the alter ego theory. They responded that the evidence showed that Clinton Foods had violated section 8(a)(5) by not bargaining with the unions over the effects of the closing of the store. Clinton Foods' counsel then said this charge was not pleaded in the complaint and he was not planning to present any evidence with respect to it. The ALJ reserved decision at this time on the question of whether the complaint charged the additional violation of failure to notify and refusal to bargain. See J.A. at 334-40.
 
 
 20
 As the hearing was drawing to a close later in the day counsel for Clinton Foods moved for a continuance on the ground that he had been surprised by the Board's reliance upon its alternative theory and he needed time to investigate the allegation. He raised the possibility that an officer or representative of Clinton Foods other than Morton might have informed the unions of the store's closing, but he made no offer of proof. At this point the ALJ ruled that the alternative refusal-to-bargain theory was not "specifically" pleaded in the complaint (J.A. at 379) but he denied the motion for a continuance. He regarded Morton's testimony as an admission against interest and viewed it as conclusive in light of Morton's responsibility for labor relations and the absence of any offer of proof. Thereafter in his decision he recommended that the Board find that Clinton Foods had violated section 8(a)(5) by failing to notify the union and that it be ordered to bargain on this issue and pay two weeks back wages to the unionized employee.
 
 
 21
 The Board adopted the ALJ's recommendation. It ruled that Clinton Foods was not prejudiced by the General Counsel's reliance upon a new theory because the failure to notify the unions of the closing was "not unrelated to the violation alleged in the complaint." 240 NLRB No. 179 at 3. The Board said:
 
 
 22
 The complaint alleges that Respondent Clinton violated Section 8(a)(5) by discontinuing its operations, resuming them under a different name, and thereafter refusing to bargain with Local 576 and Local 782. It goes on to allege that Respondent Sam & Ed's, Inc., should have continued such bargaining as the alter ego of Respondent Clinton. In these circumstances, the General Counsel, by announcing his intention to pursue an "effects theory" at the close of his case-in-chief, merely raised a variance to the complaint; namely, a refusal to bargain in connection with the same basic facts. The additional basis for finding the violation constituted neither an obligation imposed under a different section of the Act nor significantly altered the theory underlying the alleged 8(a)(5) (violation). Id. at 4.
 
 
 23
 We disagree with the Board's conclusion, for we believe that the new theory did significantly alter the charge of violation of section 8(a)(5). General Counsel's original theory, alleged in the complaint and vigorously prosecuted, was that Clinton Foods never ceased doing business, but continued to operate through its alter ego Sam & Ed's. As the ALJ put it to the General Counsel's attorney, "... you people started off the case with the alter-ego situation and you were going at it hammer and tongs until the very last witness...." (J.A. 380) However the theory to which the General Counsel retreated was predicated upon the contention that Clinton Foods did go out of business but refused to notify the unions of this decision. This violation was not charged in the complaint. The theory that it had occurred was inconsistent with the theory that Clinton Foods was still operating through Sam & Ed's, and reliance upon it was obviously an afterthought.
 
 
 24
 We think Clinton Foods was entitled to notice of such a significant shift in the General Counsel's theory of the case before it could be required to defend itself against this new charge. It was not clear until the close of the hearing, however, that the ALJ would even consider the Board's alternative theory. This notice gave Clinton Foods insufficient time to prepare a defense. Even though Morton, who was chiefly responsible for labor relations, admitted that he did not notify the unions, it was not impossible that one of the other owners or their representative had done so. Clinton Foods' attorney should not have been required to investigate this matter and be ready with an offer of proof instantly when the Board changed its line of attack, for he had no notice that the alleged failure to notify the unions would become an issue at the hearing. Although the General Counsel is entitled to rely upon alternative theories, respondents must have proper notice that this is being done. Fair play demands nothing less.
 
 
 25
 The Board relies upon cases holding that it may find an unfair labor practice other than those specifically charged in the complaint, provided that the issue "has been fully and fairly litigated". Alexander Dawson, Inc. v. NLRB, 586 F.2d 1300, 1304 (9th Cir. 1978). See also NLRB v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, 600 F.2d 770, 775 (9th Cir. 1979); American Boiler M'frs Ass'n v. NLRB, 366 F.2d 815, 821 (8th Cir. 1966). These cases are not helpful to the Board here, because the lack of notice to Clinton Foods prevented General Counsel's alternative theory from being fully and fairly litigated.
 
 
 26
 For the reasons stated, the unions' petition for review and the Board's cross-application for enforcement are both
 
 
 27
 Denied.
 
 
 
 [1]
 29 U.S.C. § 158(a):
 It shall be an unfair labor practice for an employer-
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title (dealing with the right to organize and bargain collectively); ...
 (5) to refuse to bargain collectively with the representatives of his employees....
 
 
 [2]
 In their brief, the Retail Store Employees Union also alleged that Sam & Ed's had violated section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1976) by discriminating against union members in its hiring. At oral argument, they conceded that this allegation is not properly before this court since it had not been litigated before the Board
 
 
 [3]
 Clinton Foods assigned its sublease on the store to Sam & Ed's, but Clinton remains liable under the sublease. It therefore has some interest in the success of Sam & Ed's, since it will be liable to its sublessor if Sam & Ed's fails to pay the rent. This is not an unusual business practice, however. As the ALJ noted: "There is no reason why Wetterau should release its sublessee from liability merely because the latter decides to transfer its sublease to another." 240 NLRB No. 179 at 7. There is no indication in the record that the assignment of the sublease is a means for Clinton Foods to retain ownership of this supermarket