Denzil S. **ALKIRE, a sole proprietorship, and Upshur Enterprises, Inc., a corporation, Petitioners,**
v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**
v.

**MOUNTAINEER HAULING AND RIGGING, INC., Respondent.**

Nos. 82–1135, 82–1401.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 9, 1982.

Decided Aug. 30, 1983.

Rehearing and Rehearing En Banc Denied Oct. 18, 1983.

---

**1016**

Charles M. Surber, Jr., Charleston, W.V. (Forrest H. Roles, Jackson, Kelly, Holt & O'Farrell, Charleston, W.V., on brief), for petitioners.

David S. Fishback, Washington, D.C. (William S. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Carl A. De Deo, Washington, D.C., on brief), for N.L.R.B.

Before WIDENER and SPROUSE, Circuit Judges, and GORDON,* Senior District Judge.

GORDON, Senior District Judge.

Denzil S. Alkire (Alkire), a sole proprietorship, and Upshur Enterprises, Inc. (Upshur), a corporation wholly owned by Alkire, seek review of a finding by the National Labor Relations Board (the Board) that they are both *alter egos* of Mountaineer Hauling and Rigging, Inc. (Mountaineer). As a consequence of its *alter ego* finding,

the Board ruled that all three entities had violated Sections 8(a)(1) and 8(a)(3), of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(3), when Mountaineer conditioned reinstatement of striking union members, who had been employed by Alkire and Upshur before the strike, upon submission of a new job application. 259 NLRB No. 174 (February 1, 1982). The Board has filed a cross-appeal for enforcement of its order. Because we believe that the Board misapplied the standard for imposing *alter ego* status, we decline to enforce the order and remand the case to the Board with instructions to dismiss.

**I.**

Prior to December 15, 1977, Alkire operated a trucking business hauling coal and other materials in the Buckhannon, West Virginia, area. Approximately ninety percent of the business was hauling union coal for the Badger Coal Company; the other ten per cent consisted of non-union hauling. On December 15, during a nationwide coal strike that had virtually shut down Alkire's hauling operations, Alkire informed his employees that for economic reasons he was dissolving his business. Between that date and March 6, 1978,[1] when Alkire entered a sale and lease agreement with Mountaineer for the assets of his trucking business, all activity relating to the hauling operations were carried out through Upshur.[2] These were primarily caretaking and recordkeeping functions.

Mountaineer was formed in February 1978 by Dennett Houdyeshell, a former driver for Alkire, for the purpose of taking over Alkire's trucking business. After investigating several avenues to divest him-

---

\* United States District Judge for the Middle District of North Carolina, sitting by *designation*.

1. The agreement is dated March 6, 1978. The administrative Law Judge's findings, adopted by the Board, states that the parties entered the agreement on March 27, 1978, but there is no support in the record that the agreement was signed on a date other than that which appears on its face. March 27, 1978, is the date that the new national coal agreement was signed.

2. The Administrative Law Judge found, and the Board affirmed, that during this period Upshur and Mountaineer were joint employers, and thus both liable for any labor violations occurring prior to the parties signing a written agreement. That portion of the Board's decision is not presently before this Court.

self of his hauling operations, Alkire negotiated with Houdyeshell the sale of all its assets for $250,000.00. The purchase price was to be paid with the proceeds of a Small Business Administration loan. This loan was approved in January 1978, to be effective in July 1978 when Houdyeshell finished a period of parole.

In the interim, the parties agreed that Mountaineer would lease the vehicles and equipment, with Alkire remaining responsible for taxes, licenses, and loan payments. In return, Mountaineer would pay as rent on this equipment an amount equal to its net profit on hauling operations after deduction of all expenses, including a salary to Houdyeshell. Over the period of the lease these payments amounted to less than Alkire's obligations on the equipment loans. In addition, the parties entered a separate oral employment contract under which Alkire received four hundred dollars per week for his services as a consultant to Mountaineer. In this capacity he calculated and advised Houdyeshell about job bids and supplies purchases. He had no authority over employment decisions, nor did he supervise the daily operations of the business.

In April 1978, after the end of the national coal strike, Mountaineer began hauling union coal, principally with the same customers, including Badger, for whom Alkire had hauled prior to the strike. As its operations increased, Mountaineer hired back many of the drivers who had worked for Alkire, although it refused to hire some of his former employees who sought work.[3] These personnel decisions were made by David Straight, Vice President and General Manager of Mountaineer, who had been a dispatcher with some additional personnel-related duties for Alkire and Upshur.

In July 1978 Houdyeshell informed Alkire that the SBA had cancelled his loan because of the unfair labor practice charges filed against Mountaineer, and he indicated that he had been unable to obtain alternate fi-

nancing. Thus, by its terms the sale and lease agreement terminated, and several days later Alkire sold his trucking business assets to another party.

Based upon these circumstances, the terms of the agreement between Mountaineer and Alkire, and Alkire's continued involvement in the business, the Board concluded that Mountaineer was an *alter ego* of Alkire and Upshur. Therefore, Mountaineer was under a duty to reinstate each of Alkire's drivers who had offered to return to work, and the Board found that its failure to do so in the case of nine former employees constituted an unfair labor practice in violation of the Act. The Board ordered back pay for those individuals, a remedy for which Alkire and Upshur, as *alter egos* of Mountaineer, were held jointly liable.

### II.

A principal purpose of the labor laws is to "redress the perceived imbalance of economic power between labor and management" by granting employees the right to organize, bargain collectively, and strike. *American Shipbuilding Co. v. NLRB,* 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965). The Act also restricts an employer's ability to discourage or interfere in any manner with an employee's exercise of these rights. To this end the Act creates a framework of duties only within which the contending parties are free to employ economic or other persuasive efforts to determine the conditions of their working relationship. A violation of these duties improperly alters this economic balance and is considered an unfair labor practice. *See, e.g., American Shipbuilding Co., supra.*

While these NLRA-imposed duties limit the activity of the parties within the employer-employee relationship, each party remains free to end the relationship at any time. An employee may cease to be an employee, and the employer may cease to

---

**3.** The NLRB Complaint lists nine individuals that "[o]n or about March 27, 1978, ... Respondents ... failed and refused ... to recall from layoff and/or to reinstate...." If no *alter ego* relationship existed at that time, then Mountaineer had no duty to recall or reinstate those individuals.

be an employer, for whatever reason it chooses—the employee by quitting employment, the employer by quitting business. *Textile Workers Union v. Darlington Mfg. Co.,* 380 U.S. 263, 271–72, 85 S.Ct. 994, 1000, 13 L.Ed.2d 827 (1965). Ending the relationship in this way also ends the duties each owes to the other. Thus, although the Act forbids certain types of conduct by an employer motivated by employee union activity or membership, the employer may close his entire business, even if the liquidation is motivated by vindictiveness toward the union. *Darlington Mfg. Co., supra* at 273–74, 85 S.Ct. at 1001.

■ Frequently, when one business entity ceases operation, its niche in the economic order is occupied by another entity, often utilizing the same facilities and equipment, employing a substantially identical workforce, and serving many of the former entity's customers. When the business entities are corporations these similarities alone are insufficient to overcome the normal presumption under the Labor Act, as in other areas of the law, that the corporations are separate and distinct entities with the concomitant protection of limited liability. *United Telegraph Workers v. NLRB,* 571 F.2d 665, 667 (D.C.Cir.1978).

Surrounding circumstances, however, viewed in light of national labor policy, may "require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." *John Wiley & Sons v. Livingston,* 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). Otherwise an employer would be able to alter his corporate form whenever he found it inconvenient or unprofitable to recognize NLRA-created obligations, or to remedy previous unfair labor practices. Such easy evasion of the obligations imposed by the Act would frustrate its objectives and render its protections illusory indeed.

Thus, to achieve the purposes of the Act by preventing an employer from gaining an unearned advantage in his labor activities simply by altering his corporate form, the *alter ego* doctrine will be applied, when appropriate, to treat two nominally separate business entities as if they were a single continuous employer. Application of this doctrine requires an examination of the circumstances under which the transfer of business operations was conducted, in order to determine whether the change resulted in a *"bona fide* discontinuance and a true change of ownership," or merely a "disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942).

■ If *alter ego* status is imposed upon the two entities, the labor obligations of the original employer will be carried over to the subsequent entity, and both will be held liable for any violation of these duties by either employer. The decision whether the transfer of business is a disguised continuance, and the *alter ego* doctrine applied, rests upon a factual determination. *Southport Petroleum, supra* at 106, 62 S.Ct. at 455.

### III.

Although the Court in *Southport Petroleum, supra,* indicated that "a disguise intended to evade" the labor laws was a sufficient condition to impose *alter ego* status, 315 U.S. at 106, 62 S.Ct. at 455, it did not decide whether such an intent was necessary to that determination. Absent settlement of this issue by the U.S. Supreme Court, other courts have not agreed whether some intent requirement is a prerequisite for imposition of *alter ego* status. In some cases the court has agreed with the Board's position in the instant case: that the decision rests solely upon *common control and substantially identical operations* between the two businesses.[4] *See, e.g., Nelson Elec-*

---

**4.** The Board held in its decision that "the legal principles to be applied in determining whether two factually separate employers are in fact

*alter egos* are well settled. Although each case must turn on its own facts, we generally have found *alter ego* status where the two enterpris-

*tric v. NLRB,* 638 F.2d 965 (6th Cir.1981) (citing *Crawford Door Sales Co.,* 226 NLRB 1144 (1976)). Other courts have limited the doctrine to instances of "intentional employer evasiveness." *NLRB v. Scott Printing Corp.,* 612 F.2d 783 (3d Cir.1979) (assuming intent to evade labor duty required).

In most cases, however, the courts set out no minimum criteria for applying the doctrine, but merely list the facts that form the basis for its decision. Often these facts include an element of intentional employer evasiveness or at least indicate that the original employer received a benefit from the transfer of operations to the new business entity. *See, e.g., NLRB v. Ozark Hardwood Co.,* 282 F.2d 1 (8th Cir.1960); *NLRB v. O'Keefe & Merritt Mfg. Co.,* 178 F.2d 445 (9th Cir.1949); *see also, NLRB v. Scott Printing Corp., supra* at 790–91 (dissenting opinion) (listing seven cases).

For example, in *O'Keefe & Merritt Mfg. Co., supra,* the owners of a corporation, after delaying for weeks negotiations with the union approved by an employee election, transferred all operations to a partnership composed of substantially the same individuals. The day before announcing the transfer of operations, the partnership signed a contract on favorable terms with a rival union. In applying the doctrine of *Southport Petroleum Co., supra,* the court pointed to the "economic motive" of the employer in wishing to deal with the second union, and it held that the transfer was a scheme to obtain this advantage rather than a *bona fide* transaction. 178 F.2d at 449.

Likewise, in *Ozark Hardwood, supra,* the court concluded that a disguised continuance existed when the old and new employers operated "under a relationship serving to benefit the [old employer's] owners and intended as one of cooperation with them in evading the consequences of the unfair labor practices committed." 282 F.2d at 5. The owners of the original employer had utilized a foreclosure scheme in order to transfer operations to a second corporation they had set up for that purpose. The court agreed with the NLRB that the foreclosure had been unnecessary, that it had been precipitated specifically as a means of enabling the owners to transfer its operations to another entity, and that the transfer would not have occurred except for the existence of unfair labor charges against the original business and the desire of the owners to benefit by escaping the consequences of these charges while retaining control of the business. 282 F.2d at 6–7.

On the other hand, *alter ego* status has been denied when, despite a continuity of operations between the two entities, a transfer of operations results in no continued control by nor an economic benefit to the owners of the original business. In *NLRB v. Bell Co., Inc.,* 561 F.2d 1264 (7th Cir.1977), the court found that while there was substantial similarity between the operations of the original and subsequent employers, no evidence existed that the prior owners "controlled *or benefited from* the operation" of the new business. 561 F.2d at 1268 (emphasis added). Under these circumstances the court found that an *alter ego* determination was inappropriate. *Id.*

One emphasis in each of these cases is whether the owners of the original business entity obtain a benefit from transferring business operations to another entity that they also control. Linking liability to the existence of this benefit in this manner accords with the Supreme Court's analysis of an employer's labor law liability in a closely analogous situation. That is, when an employer decides to close only a portion of his business operations, his decision may affect the labor relations at other operations he controls and that remain in business. In both the *alter ego* and the partial closing situation there is commonality of control, a business termination, and a potential effect on those rights protected by the labor laws. In *Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994,

es have 'substantially identical' management, business purposes, operation, equipment, cus-

tomers, and supervision, as well as ownership."

13 L.Ed.2d 827 (1965), the Supreme Court determined the appropriate standard for employer liability in a partial closing case.

In *Darlington* the Court reversed an *en banc* decision of this Court, which had held that the closing of one of several manufacturing plants operated as an integrated business enterprise was not an unfair labor practice, even if motivated by antiunion animus.

Darlington Manufacturing Co. was one of seventeen textile manufacturers controlled by Roger Milliken, either individually or through his family. Immediately after the Textile Workers Union won an election at the sole textile mill operated by Darlington, Milliken engineered a liquidation of the corporation. The Board found that this business termination was a result of Milliken's union animosity and held the closure to be an unfair labor practice. This Court held that an employer had an absolute right to close all or part of his business regardless of antiunion motives and refused to enforce the Board's order. 325 F.2d 682 (4th Cir. 1963).

The Supreme Court agreed that had Darlington been an independent employer, it could have closed its business because of antiunion animus without violating the labor laws. Nevertheless, considering the other entities controlled by Milliken, the Court concluded that the purpose and effect of this "partial closing" relative to the labor situation of the remaining businesses must be considered to determine if the closing was an unfair labor practice. 380 U.S. at 275, 85 S.Ct. at 1002.

The distinguishing feature between a complete closing and a partial closing, the Court explained, was the potential for a reasonably expected benefit resulting from the impact of the closing on the employer's remaining labor situation.

The closing of an entire business, even though discriminatory, ends the employer-employee relationship; the force of such a closing is entirely spent as to that business when termination of the enterprise takes place. On the other hand, a discriminatory partial closing may have repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of § 7 rights among remaining employees....
380 U.S. at 274–75, 85 S.Ct. at 1001–1002. The Court found that this sort of employer action—the improper use of an economic weapon in an effort to obtain a future benefit—was exactly the sort of conduct that the labor laws were intended to prevent. 380 U.S. at 271, 275, 85 S.Ct. at 1000, 1002.

■ A similar analysis is appropriate in determining whether *alter ego* status should be imposed. When business operations are transferred, the initial question is whether substantially the same entity controls both the old and new employer. If this control exists, then the inquiry must turn to whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations.

Without some future benefit reasonably accruing from the employer's action, then the "force" of the action ends with the transfer itself, and the transfer of ownership is *bona fide*. If, however, the transfer, by eliminating an NLRA-imposed duty, provides a continuing benefit to the old employer, then the force of the closing survives the transfer. To the extent that obtaining the benefit was a motive for the transfer, or was a reasonably foreseeable effect, the result represents a disguised continuance of the old employer.

Linking employer motivation for the transfer of its business to obtaining a future benefit represents a broader standard than does requiring "[a]ntiunion animus or intent to evade labor obligations," *Scott Printing Corp., supra* at 790 (dissenting opinion), and better strikes a balance between the notion of limited corporate liability and the protection of those employee rights embodied in the national labor laws. In many cases the employer's intended benefit may be, in fact, evasion of a labor obligation; but that situation poses no problem for imposing *alter ego* status. In other cases, however, the employer may in-

tend no evasiveness or subterfuge, but merely seeks what it believes is a legitimate benefit offered by a strategic business reorganization.

■ Nevertheless, the effect is the same in both situations: the employer obtains an economic benefit at the expense of statutory employee rights, upsetting and undermining the balance of power between labor and management created to reflect national labor policy. By eliminating the benefit derived from transferring operations to a separate entity, the *alter ego* doctrine redresses this economic imbalance. If the employer obtains no benefit from the transfer, however, and none was reasonably foreseeable, nothing in labor policy justifies preventing it from arranging its affairs as it sees fit.[5]

## IV.

■ The Board's order cannot be enforced in this case because it made no finding concerning an economic benefit obtained, or reasonably expected, by Alkire as a result of the transfer of the hauling operations to Mountaineer. Although the normal procedure would be to remand this case to the Board to allow it an opportunity to make such findings, *see NLRB v. Scott Printing Corp., supra* at 789, a complete lack of evidence in the record upon which to base such a finding renders a remand for that purpose unnecessary.

It is undisputed that the sale provisions of the sale and lease agreement, signed by Alkire and Mountaineer on March 6, 1978, and effective from that date until automatically terminated upon failure of the condi-

tion precedent of the federally guaranteed loan approval, contemplate a complete and absolute sale of the assets of the business, with Alkire retaining no interest in or benefit from the continued operation of the business other than the sale price itself. Nothing in the terms or manner of this sale would permit Alkire to benefit from the elimination of any labor obligation.

Under the lease term of the agreement, Alkire was to receive one hundred per cent of the net profit of the business as rent for the use of the equipment. This provision raises a potential for some benefit to Alkire, assuming that Mountaineer's labor costs would be lower—and thus its profit higher—by freeing the business from some labor duty owed by Alkire. There is absolutely no evidence, however, that such a benefit accrued or was contemplated.

In fact, the evidence indicates that the purpose of this provision was to protect Alkire's interest in his equipment and to provide a source of funds for him to continue making payments on the equipment loans, for which he remained responsible until the consummation of the sale. Although the testimony is unclear as to the exact amount of the rent payments, the evidence indicates that the total of these payments was less than the amount of Alkire's loan obligations on the equipment leased to Mountaineer over the same period.

At best this evidence rises only to the level of speculation or conjecture that some benefit accrued. It is clearly insufficient to support a finding that Alkire reasonably expected or actually obtained a benefit

---

5. This analysis for imposition of *alter ego* status is similar to the standard employed to pierce the corporate veil of a subsidiary corporation and hold its owner(s) liable for the debts of that subsidiary. In corporate law, as in the labor field, the *alter ego* doctrine is an equitable principle designed to prevent an entity from doing injury and then escaping responsibility by hiding behind a corporate shield. *See Plumbers & Fitters, Local 761 v. Matt J. Zaich Const. Co.,* 418 F.2d 1054 (9th Cir.1969). Application of the doctrine in corporate law rests upon control by the parent and misuse of that control that causes an injury by the subsidiary.

Wrongdoing by the parent need not amount to plain fraud or illegality, but the injured party must show some connection between its injury and the parent's improper manner of doing business. *See, e.g., DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976); *Krivo Indus. Supply Co. v. National Distill. & Chem. Corp.,* 483 F.2d 1098 (5th Cir. 1973); *Certain-Teed Products Corp. v. Wallinger,* 89 F.2d 427 (4th Cir.1937). Without that connection, even when the parent exercises domination and control over the subsidiary, corporate separateness will be recognized. *Plumbers & Fitters, Local 761, supra.*

from the transfer of his business operations to Mountaineer.[6]

Therefore, because upon a review of the entire record, there appears no basis upon which one may reasonably conclude that Alkire received or expected any benefit from this transaction,[7] the Board's finding that Alkire's termination of business was not *bona fide* is unfounded. Alkire's and Upshur's liability based on *alter ego* status is improper, and the Board's application for enforcement of its order is denied. This case is remanded with instructions to dismiss any charges of unfair labor practices based on actions occurring subsequent to March 6, 1978.

**ENFORCEMENT DENIED.**

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent.

I agree with most of the well-written majority opinion, insofar as it correctly identifies the employer and employee interests which are invariably at loggerheads in alter ego cases. My principal disagreement, however, is with the majority's conclusion that "employer motivation" is central to determining alter ego status. As the majority concedes, *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 (1942), does not require the NLRB to show that the employer intended to evade the purposes of the NLRA, in order to find alter ego status. Nor has such a requirement been imposed by the many courts which have discussed Board findings of alter ego status. *See, e.g., Amalgamated Meat Cutters & Butcher Workmen, AFL–CIO, Local 576 v. NLRB*, 663 F.2d 223,

226–27 (D.C.Cir.1980), *citing with approval, Crawford Door Sales Co.*, 226 N.L.R.B. 1144 (1976); *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir.1981); *NLRB v. O'Keefe & Merritt Mfg. Co.*, 178 F.2d 445, 448–49 (9th Cir.1949); *NLRB v. Nat'l Garment Co.*, 166 F.2d 233, 238 (8th Cir.), *cert. denied*, 334 U.S. 845, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948). The United States Supreme Court has not decided the question, but it has indicated that alter ego status is not limited to employers who purposefully attempt to evade the effects of the labor laws:

> Such [alter ego] cases involve a mere technical change in the structure or identity of the employing entity, *frequently to avoid the effect of the labor laws*, without any substantial change in its ownership or management. In these circumstances, the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor.

*Howard Johnson Co. v. Detroit Joint Exec. Bd.*, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974) (emphasis added). This language identifies the crucial inquiry as whether a substantial change in ownership or management has occurred. Employer motivation may be relevant to this inquiry, but it is certainly not, as the majority apparently believes, determinative.

The guiding rationale in alter ego cases is whether the employer is "merely a disguised continuance of the old employer." *Southport Petroleum Co.*, 315 U.S. at 106, 62 S.Ct. at 455. That rationale, in my mind,

---

**6.** In addition, the evidence in the record demonstrating Alkire's control of Mountaineer's operations appears to fall far short of the degree of control exercised by former owners in situations in which courts have imposed an *alter ego* relationship. Compare *NLRB v. Scott Printing Corp., supra; NLRB v. Herman Bros. Pet Supply*, 325 F.2d 68 (6th Cir.1963) with *NLRB v. Bell Co., Inc., supra* (insufficient control exercised). Given our decision in this case, however, we need not reach this issue.

**7.** The principal disagreement between the majority and dissenting opinions may rest upon

this finding. The dissent concludes that the evidence supports a finding that "Alkire simply chose two of his employees to operate his business until such time as he could favorably dispose of it," and that he "exercised all the prerogatives of ownership, yet, ... remained free of the responsibilities imposed by the NLRA." If we agreed that the evidence permitted such an interpretation of Alkire's actions, we would not hesitate to conclude that Mountaineer was "merely a disguised continuance of the old employer."

requires a finding that Denzil Alkire and Upshur Enterprises were the alter egos of Mountaineer Hauling & Rigging. The evidence, viewed realistically, supports a finding that Alkire simply chose two of his employees to operate his business until such time as he could favorably dispose of it. Alkire was guaranteed the net profits generated by the business under the terms of his lease-purchase agreement with Mountaineer. He was given $400 per week salary for services which actually amounted to managing the business. Additionally, he retained the responsibility for paying all property taxes, license fees, equipment loan payments, insurance premiums and equipment maintenance costs. Significantly, Alkire retained the right to claim the tax advantages of equipment depreciation. His control over the business further was revealed by his payment of Mountaineer's first month's payroll and by his later conduct of cosigning a loan agreement for the purchase of ten new trucks. Moreover, he exercised the ultimate act of ownership when he sold the business to H & A Hauling, Inc., after Mountaineer failed to raise the $250,000 purchase price. Throughout the life of the lease purchase agreement, Alkire exercised all the prerogatives of ownership, yet, in the majority's view, remained free of the responsibilities imposed by the NLRA—a classic case of "having your economic cake and eating it, too."

Substantial evidence existed to support the Board's finding of alter ego status and I would enforce its order.