Michael H. HOLLAND, Marty D. Hudson, Thomas F. Connors, and Robert T. Wallace, as Trustees of the United Mine Workers of America 1992 Benefit Plan, Plaintiffs,

v.

HIGH–TECH COLLIERIES, INC., a corporation, Dynamic Recovery, Inc., a corporation, Hayhurst & Hill, Inc., a corporation, Canon Coal Corporation, a corporation, and Jampac, Inc., a corporation, Defendants and Third–Party Plaintiffs,

v.

VESTA MINING COMPANY, a corporation, Third–Party Defendant.

Civ. A. No. 1:93–CV–158.

United States District Court, N.D. West Virginia.

Jan. 12, 1996.

Gary A. Collias, McIntyre & Collias, Charleston, WV, Kenneth M. Johnson, UMWA Health & Retirement Funds, Washington, DC, David W. Allen, Stacey M. Blumer, UMWA 1992 Benefit Plan, Office of the General Counsel, Washington, DC, Christopher F. Clarke, UMWA Health & Retirement Funds, Senior Associate Counsel, Washington, DC, for Plaintiffs and Counter–Defendant Michael H. Holland, Marty D. Holland, Thomas F. Connors, Robert T. Wallace, as Trustees of the United Mine Workers of America 1992 Benefit Plan.

Philip C. Petty, Rose, Padden & Petty, LC, Fairmont, WV, for Defendants and Third–Party Plaintiffs, and Counter–Defendants, High–Tech Collieries, and Dynamic Recovery, Incorporated, and Defendants and Third–Party Plaintiffs, Hayhurst & Hill, Incorporated, Canon Coal Corporation, Jampac, Incorporated.

Jacqueline A. Wilson, Steptoe & Johnson, Clarksburg, WV, for third-Party Defendant and Counter–Claimant, Vesta Mining Company.

### MEMORANDUM OPINION

KEELEY, District Judge.

In 1992, Congress passed the National Coal Industry Retiree Health Benefit Act ("Coal Act") to "remedy problems with the provision and funding of health care benefits ... to retirees in the coal industry; (2) to allow for sufficient operating assets for [multi-employer benefit] plans; and (3) to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans." Findings and Declaration of Policy, Pub.L. No. 102–486, § 19142. The Act, 26 U.S.C. § 9701 *et seq.*, created two funds to accomplish these purposes, the UMWA Combined Benefit Fund and the 1992 Plan, and provided for the elimination of the two existing industry-wide plans, the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan. It imposed ongoing financing obligations upon employers who, presently and in the past, have employed qualified retirees in the coal industry, and upon "related persons" to those employers. The Act further required that former employers maintaining health plans as of February 1, 1993, pursuant to a current or past National Bituminous Coal Wage Agreement ("NBCWA"), continue to maintain those plans.

The newly established Combined Benefit Fund is required to provide benefits to all coal industry retirees and their dependents who "on July 20, 1992 w[ere] eligible to receive, and receiving, benefits from the UMWA 1950 Benefit Fund or the UMWA 1974 Benefit Fund...." 26 U.S.C. § 9703(f).

The 1992 Plan is required to provide benefits to any individual who:

> but for the enactment of [the Coal Act] would be eligible to receive benefits from the [1950 or 1974 Benefit Plans], based upon age and service earned as of February 1, 1993; or with respect to whom coverage is required to be provided under section 9711 [directly by an individual employer], but who does not receive such coverage....

26 U.S.C. § 9712(b)(2). Excluded from coverage by the 1992 Plan are individuals who retire after September 30, 1994, and their dependents, and anyone receiving benefits from the Combined Fund. 26 U.S.C. § 9712(b).

These benefits are financed primarily by premiums charged to current and former employers. 26 U.S.C. §§ 9704 and 9712(d). All of these liabilities are owed, not only by the specific employer charged with the liability, but also jointly and severally by all "related persons" to the employer. 26 U.S.C.

§§ 9704(a) and 9712(d)(4); *see* 26 U.S.C. § 9701(c)(2).

The Trustees of the 1992 Benefit Plan have sued High–Tech Collieries, Inc. (hereinafter "High–Tech") to recover several hundred thousand dollars in premiums to cover retirees for whom it is the "last signatory operator," that is, a person who signed a coal wage agreement who, "with respect to a coal industry retiree, ... was the most recent coal industry employer of such retiree." 26 U.S.C. §§ 9701(c)(1) and (2). The Trustees have brought in the other defendants, Dynamic Recovery, Inc. ("Dynamic"), Hayhurst & Hill, Inc., ("Hayhurst"), Canon Coal Corporation ("Canon"), and Jampac, Inc. ("Jampac"), as related persons to High Tech. The defendants filed a third-party complaint against Vesta Mining Company ("Vesta") seeking to enforce a Memorandum of Agreement which, they stated, required Vesta to reimburse High–Tech for all labor related costs, including retiree benefits. Vesta has counterclaimed for monies it advanced to High–Tech and Dynamic to assist them in covering health care costs of their workers and retirees. The Trustees and Vesta have filed for summary judgment and the issues have been fully briefed and argued. After careful consideration of the briefs, including the supplements, the Court concludes that both motions should be granted.

## I. *STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate only if there are no genuine issues of material fact. *Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This burden does not require the moving party to show evidence that proves absence of a genuine issue of material fact, but only to point out its absence. *Id.*

The burden then shifts to the party opposing the motion. The adverse party may not rest upon mere allegations or denials, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, and summary judgment is appropriate if the adverse party fails to show, under Rule 56, the existence of an element essential to that party's case. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. A mere scintilla of evidence supporting the case is insufficient. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. With regard to the burden on the adverse party, Rule 56(e) provides in part that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

## II. *UNDISPUTED FACTS*

The Trustees have presented, and the defendants concede the following facts:

1. Plaintiffs are the Trustees of the United Mine Workers of America ("UMWA") 1992 Benefit Plan, which is an irrevocable trust fund created pursuant to § 9712 of the Coal Industry Retiree Benefit Act of 1992 ("the Coal Act"), 26 U.S.C. § 9712.

2. Defendant High–Tech is a West Virginia corporation, which was signatory to the National Bituminous Coal Wage Agreement ("NBCWA") of 1984.

3. High–Tech ceased to be in business for purposes of imposing liability on related persons under the Coal Act on March 31, 1992.

4. High–Tech has been owned 100 percent by Jane Hayhurst since February 18, 1987.

5. Jampac was owned by James Hayhurst and Jane Hayhurst in equal shares from October, 1987 until November, 1991.

Jampac has been owned 100 percent by Jane Hayhurst since November, 1991.

6. Dynamic has been owned in equal shares by James Hayhurst and Jane Hayhurst since April 15, 1987.

7. Canon has been a wholly owned subsidiary of Dynamic since 1987.

8. James Hayhurst has owned 100 percent of Hayhurst & Hill since December, 1982.

9. Dynamic is a related person to High-Tech pursuant to 26 U.S.C. § 9701(c)(2)(A).

10. Hayhurst & Hill is a related person to High-Tech pursuant to 26 U.S.C. § 9701(c)(2)(A).

11. High-Tech has been assessed liability to the 1992 Plan for eligible beneficiaries, although the number of such beneficiaries is a subject of dispute.

12. To date, no payments have been made to the 1992 Plan on behalf of. High-Tech's assigned beneficiaries.

13. Jampac's 1991 federal income tax return indicates that the following companies were members of its controlled group of corporations consenting to the apportionment of low-bracket income under 26 U.S.C. § 1561: High-Tech Collieries, Inc., Dynamic Recovery, Inc., Hayhurst & Hill, Inc. and Canon Coal Corporation.

### III. *TRUSTEES MOTION FOR SUMMARY JUDGMENT*

Based on these undisputed facts, the Trustees argue that, as a signatory operator to the 1984 NBCWA, High-Tech is a signatory operator for purposes of the Act and a last signatory operator for 51 retired beneficiaries.[1] High-Tech would therefore be liable for the payment of monthly per-beneficiary premiums for each eligible beneficiary attributed to it who is receiving benefits under the 1992 Plan. The premiums through November 1, 1994 total $298,801.47. The Trustees seek joint and several liability from the other defendants as "related persons," and the defendants concede that, if High-Tech is liable, Dynamic and Hayhurst are also liable, although the related person status of the other defendants is an issue.

In opposition, High-Tech argues first that it never employed the assigned retirees, that it was a shell or alter ego of Vesta, who told it who to hire, when to start up, when to close down, where and when to work and who paid all of the costs of the mine operations. Thus, High-Tech seeks indemnification from Vesta. The defendants all claim that the assignment of the 51 beneficiaries was inappropriate due to the short period of coal mining operations by High-Tech and they argue that the Coal Act is unconstitutional. The issues are discussed below in reverse order.

### A. *Constitutionality*

The defendants allege two constitutional deficiencies in the Coal Act: first, that the Act violates the Due Process Clause of the Fifth Amendment, and second, that it constitutes a taking of private property for public use without just compensation in violation of the Taking Clause of that Amendment. They concede, however, that every court that has looked at the issues has found the Coal Act to be constitutional on both grounds. In fact, two of the cases discussed by the parties have now been affirmed on appeal. *LTV Steel Co., Inc. v. Shalala (In re: Chateaugay Corp.)*, 53 F.3d 478 (2d Cir.1995); *Barrick Gold Exploration, Inc. v. Hudson*, 47 F.3d 832 (6th Cir.1995). However, since this case was briefed, the District Court of the Western District of Pennsylvania has found the Coal Act unconstitutional as applied to a small, family owned non-coal business which was successor to several small coal companies. *Unity Real Estate Co. v. Hudson*, 889 F.Supp. 818 (W.D.Pa.1995).

The defendants have not thoroughly briefed the issues due to economic concerns and seek only to preserve the issues in the

---

1. The 51 retired beneficiaries were assigned to High Tech based on a review of pension applications. The number may increase, for example, when certain persons currently covered by individual employer plans become eligible, due to the individual plan ceasing to provide coverage. The number may also decrease, i.e., when the retiree dies, or fails to apply for Part B Medicare benefits, or when children reach the age of majority.

event a favorable decision, finding the Act unconstitutional, would issue from an appellate Court and save the day for them. As the Sixth Circuit in *Barrick Gold* noted, however, the United States Supreme Court has not overturned economic legislation since 1935 in *Railroad Retirement Bd. v. Alton Railroad,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). In fact, the Supreme Court in 1976 held:

> It is by now well established that Legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). *See also, Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (upholding withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) against a substantive due process challenge); *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (holding that the withdrawal liability provisions of the MPPAA do not violate the taking clause); *Pension Benefit Guaranty Corp. v. R.A. Gray,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (retroactivity of withdrawal liability provisions of the MPPAA does not violate due process).

■ In light of the Supreme Court's reluctance for reviewing the wisdom of economic statutes, Easterbrook, "The Constitution of Business," 11 Geo. Mason U.L.Rev. 53 (1988), and without the benefit of thorough briefing from the parties, this Court declines to overlook the overwhelming precedent on the constitutionality of the Coal Act, particularly on the due process issue. I, therefore, adopt the reasoning and analysis of the Second Circuit in *LTV Steel* [2] and find that the Coal Act is a rational scheme to achieve a legiti-mate legislative purpose, satisfying all of the requirements of substantial due process.

■ The Taking Clause argument is slightly more problematic. In *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1024, the Supreme Court upheld the MPPAA against a facial challenge under the Taking Clause and found that because the United States would take nothing for its own use and all benefits collected under the withdrawal liability provisions would redound to the benefit of the Pension Trusts. Since the imposition of such withdrawal liability was within the power of Congress, the provisions were not facially invalid under the Taking Clause. The issue here is similar. Congress enacted the Coal Act to enforce the coal miner's legitimate expectations of health care benefits by ensuring that the Benefit Plan would remain finan-cially healthy. None of the monies collected become the property of the United States, and all such monies will go to benefit the miners. Thus, on its face, the Coal Act does not violate the Taking Clause.

The *Connolly* court then identified a process of "ad hoc, factual inquiries into the circumstances of each particular case," *id.,* with particular emphasis on three factors: (1) "the economic impact of the regulation on the claimant" (here, the defendants); (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; and (3) "the character of the governmental action." *Id.* at 225, 106 S.Ct. at 1026 (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). Even if the Act is facially valid, it could be found to violate the Takings Clause in a particular case, based on the factual analysis under these factors. *Unity Real Estate, supra,* is illustrative. In that case, Judge Smith acknowledged the number and consistency of decisions upholding the Coal Act, but found that the economic impact of the premiums on a small company that had never been in the coal business, but was the surviving entity after a merger of small inactive coal companies, was qualitatively and quantitatively so out of proportion

---

**2.** The Sixth Circuit in *Barrick Gold, supra* at 837, was looking at a more narrow issue than was present in *LTV Steel,* that is, whether the Coal Act violated the Fifth Amendment by not providing refunds, credit or offsets for contractual withdrawal liability cases.

to the role of the company as to constitute a taking within the meaning of the Fifth Amendment. The court further found that the nature of the governmental action was permanent appropriation of the employer's assets for the government's use, and that it was unreasonable to expect the company to foresee legislation that would reach back a decade to change contractual obligations. Thus, all of the *Connolly* factors weighed in favor of the company, and the Court issued a preliminary injunction restraining the Trustees from enforcing the Coal Act against Unity.

The critical factor for the *Unity Real Estate* court was the economic impact on the company: "Unity does not have enough cash on hand to pay even the first month's premium and its net worth is less than its first year obligation." 889 F.Supp. at 821. That premium equalled $96,158.84. Unity would be bankrupt after the first several months of payments, with just 76 beneficiaries assigned. In contrast, in *LTV Steel, supra* at 495, LTV's chief financial officer testified that the "Coal Act obligations will not interfere with LTV's ability to emerge from bankruptcy and to return to profitability," although LTV was assigned 5,667 beneficiaries, with a first year premium of $12,727,118.61.

High–Tech argues that it operated the mine for only eleven months and is now subject to accrued liability of over $300,000 and future monthly payments exceeding $20,-000. However, the Court lacks information concerning High–Tech's net worth, profitability and current operations, so there can be no determination of economic impact. Additionally, the defendants have made no showing that the required payments would be completely out of proportion to their activities under the NBCWA. *See Templeton Coal Co. v. Shalala,* 855 F.Supp. 990, 1004 (S.D.Ind. 1993).

This Court can agree with the courts in *Templeton, supra,* and *Blue Diamond Coal Co. v. Shalala (In re: Blue Diamond Coal Co.),* 174 B.R. 722 (E.D.Tenn.1994), that certain aspects of the Coal Act have a "draconi-

an air" and may be "at the very edge of the broad range of permissible legislative allocation of specific economic burdens," *Templeton, supra* at 1004. But on the record before it, the Court can only conclude that the *Connolly* factors must be decided against the defendants, and that the Coal Act does not constitute a governmental taking without compensation in violation of the Fifth Amendment.

### B. *Appropriateness of Assignment of Beneficiaries*

As noted above, the Trustees have charged High–Tech with premiums for 51 beneficiaries, a number which will fluctuate over time, and have provided the defendants with a list of the beneficiaries with their birthdates and the dates they were added to the Plan, in addition to the retirees' Social Security numbers. The defendants argue that there is no proof that any of the retirees were ever employees of High–Tech.

■ Unfortunately, High–Tech has offered nothing to rebut the list or the assignment, not an example, not an affidavit, not even a straight forward denial, to allow the Court to find a genuine issue of material fact as to whether these beneficiaries were not its employees. The bald assertion that there is such an issue is insufficient to withstand summary judgment. *Compare Unity Real Estate,* 889 F.Supp. at 837[3] (president of Unity who was personally involved in mining operations of predecessor companies could recognize only eight beneficiaries as former employees, had no records which had been turned over to Trustees of 1950 Fund). Without contrary evidence, the Court will find that the assignees were employees of High–Tech or their dependents and were properly assigned.

■ High–Tech's second argument is that it employed the miners for only eleven months and then laid them off, so that it cannot be the last signatory operator. It points to the definition of responsible operator under the Black Lung Benefits Program,

**3.** These facts are found in the Report and Recommendation of the Magistrate Judge which the District Court fully accepted.

30 U.S.C. § 901, 20 C.F.R. § 725.493, which is the last operator for whom the miner worked for a period of twelve months. Also, in the assignment of beneficiaries under the Combined Plan, the Trustees are directed to look first to the signatory operator who "was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least two years." 26 U.S.C. § 9706(a)(1)(B).

■ However, it is apparent from a close reading of the 1992 Coal Act that it has four distinct subchapters. Subchapters A and D are of general applicability. Subchapter B (Sections 9702–9708) establishes the UMWA Combined Fund, and provides a method for assigning beneficiaries thereto and financing the benefits to be provided. Subchapter C requires continuation of certain individual employer plans and establishes the 1992 Plan, providing a method for assigning beneficiaries thereto and financing the benefits to be provided. Subchapters B and C are entirely separate and distinct, with different definitions of the terms "eligible beneficiary" and "signatory operator" and there is nothing in the Act that would suggest that the three-tiered assignment process of Subchapter B (§ 9706) would carry over to the assignment process of Subchapter C (§ 9712). "[T]he duty of this Court is to give effect to the plain meaning of the statute, not to pass judgment on its wisdom or fairness," *Holland v. Double G Coal Co., Inc.*, 898 F.Supp. 351, 355 (S.D.W.Va.1995), and the Court has no authority to relegislate definitions found in a thoroughly developed act of Congress. High–Tech's remedy, as it conceded at the pre-trial conference, is legislative, not judicial.

### C. *Relationship with Vesta.*

■ High–Tech seeks to avoid liability to the Trustees by pointing to Vesta as the actual employer of the miners at the Vesta Mine with High–Tech acting only as mine manager rather than owner/operator. Alternatively, it seeks indemnity from Vesta. The Trustees, however, point to the testimony of

James Hayhurst, whose wife was a major stockholder of High–Tech, and who acted as on-site manager of the mine. Mr. Hayhurst acknowledged that High–Tech had responsibility for payroll, health insurance, "black lung" benefits, pensions and all other related labor costs, which establishes High–Tech as the employer at the mine site. Further, High–Tech, through its President Stanley Sears, signed a memorandum agreement with the United Mine Workers acknowledging that it was a successor to Vesta and bound to the 1984 NBCWA, which required it to provide health care coverage to employees, retirees, and other persons eligible for such benefits. Thus, High–Tech is the "last signatory operator" for the retirees of the Vesta Mine and is liable for the premiums for their health benefits irrespective of its memorandum of agreement with Vesta. *See Carbon Fuel Company v. USX Corporation*, 891 F.Supp. 1186, 1198 (S.D.W.Va.1995) ("The Act reaches back and places all liability on the last signatory operator who employed the miner at his or her retirement.") [4]

### D. *Related Persons.*

The Coal Act, at 26 U.S.C. § 9712(d)(4), imposes joint and several liability on a last signatory operator and any related person to such operator "for any amount required to be paid by such operator under this section." As noted above, Dynamic and Hayhurst have admitted that they are related persons to High–Tech under the Coal Act, but Jampac and Canon contest that status. Related persons are defined at 26 U.S.C. § 9701(c)(2) as follows:

> (A) In general.—A person shall be considered to be a related person to a signatory operator if that person is—
>
> (i) a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;
>
> (ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

---

**4.** The issue regarding indemnity from Vesta will be considered below, on Vesta's motion for summary judgment.

(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii).

(B) Time for determination.—The relationships described in clauses (i), (ii), and (iii) of subparagraph (A) shall be determined as of July 20, 1992, except that if, on July 20, 1992, a signatory operator is no longer in business, the relationships shall be determined as of the time immediately before such operator ceased to be in business.

The citation to section 52(a) refers to 26 U.S.C. § 52(a) which states that

the term 'controlled group of corporations' has the meaning given to such term in section 1563(a) except that 'more than 50 percent' shall be substituted for 'at least 80 percent' each place it appears in section 1563(a)(1).

Section 1563(a), 26 U.S.C. § 1563(a), describes three types of controlled groups, stating:

[T]he term 'controlled group of corporations' means any group of

(1) Parent-subsidiary controlled group: one or more chains of corporations connected through stock ownership with a common parent corporation if stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total shares of all classes of stock of each of the corporations, except the common parent, is owned by one or more of the other corporations and the common parent corporation owns stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total

value of shares of all classes of stock of at least one of the other corporations ... or

(2) Brother—sister controlled group: two or more corporations if 5 or fewer persons who are individuals, estates or trusts own stock possessing at least 80 percent of the combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each corporation, and more than 80 percent of the total combined voting power of all classes stock entitled to vote or more than 80 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent that such stock ownership is identical with respect to each such corporation, or

(3) Combined group: Three or more corporations each of which is a member of a group of corporations described in paragraph (1) or (2), and one of which (A) is a common parent corporation included in a group of corporations described in paragraph (1), and also (B) is included in a group of corporations described in paragraph (2).

■ As demonstrated by the deposition testimony of James Hayhurst, the defendants' interrogatory responses, as well as their federal tax returns and stock certificates, High–Tech, Canon and Jampac constitute a controlled group of corporations because Jane Hayhurst and James Hayhurst collectively own, and have owned at all relevant times,[5] 100 percent of the stock of each company.

### i. *Jampac is a related person to High–Tech.*

■ Jampac and High–Tech are a "brother-sister" controlled group under § 1563(a)(2). High–Tech has been owned 100 percent by Jane Hayhurst since February 18, 1987. Jane Hayhurst has also owned 100 percent of Jampac since November, 1991. Thus, Jampac and High–Tech were owned 100 percent by Jane Hayhurst on the date that High–Tech ceased to be in business, and

---

**5.** High–Tech ceased to be in business as of March 31, 1992, so the relationship between the companies is determined as of that date. 26 U.S.C. § 9701(c)(2)(B)

they form a "brother—sister" controlled group of corporations under 26 U.S.C. § 1563(a)(2). Indeed, Jampac's federal tax returns for 1991 indicate that each of the defendants to this action are members of a "controlled group of corporations" for purposes of receiving tax benefits under 26 U.S.C. § 1561(a). Therefore, Jampac is a related person to High–Tech within the meaning of § 9701(c)(2).

### ii. *Canon is a related person to High–Tech.*

■ Canon qualifies as a "combined" controlled group member with High–Tech and Canon's parent corporation, Dynamic, under 26 U.S.C. § 1563(a)(3). As stated above, § 1563(a)(3) describes a combined group as follows:

Three or more corporations each of which is a member of a group of corporations described in paragraph (1) (parent-subsidiary) or (2) (brother-sister), and one of which

(A) is a common parent corporation included in a group of corporations described in paragraph (1), and also

(B) is included in a group of corporations described in paragraph (2).

■ Thus, the test for a combined group is tripartite. First, at least one member of the group must be a parent corporation of another member. Canon has been a wholly owned subsidiary of Dynamic since 1987. Thus, Canon and Dynamic are a parent-subsidiary group under § 1563(a)(1), and the first prong of the test is satisfied. Second, at least two members of the group must be brother-sister corporations. High–Tech and Dynamic admit to being related persons, and therefore, by definition, admit to being com-

monly controlled under § 1563(a). Clearly, the type of controlled group which Dynamic and High–Tech admit being is a brother-sister group under § 1563(a)(2), and the second prong of the test is satisfied.[6] Finally, one member of the group must be in both a parent-subsidiary relationship and a brother-sister relationship. Dynamic meets this last requirement because it is the parent of Canon and the brother of High–Tech. Accordingly, High–Tech, Dynamic and Canon form a "combined group" under §§ 1563(a)(3) and 52(a), and therefore are related persons under § 9701(c)(2)(A) of the Coal Act.

The legislative history makes clear that the Coal Act's "overriding purpose is to find and designate a specific obligor for as many beneficiaries in the plans as possible." 102 Cong.Rec. 17,604 (daily ed. October 8, 1992) (reprint of conference Report on the Coal Act). In addition, "the definition of related persons is intentionally very broad." *Id.* Here, however, the "relatedness" of the defendants is clear, and the Court finds that High–Tech, Canon, Dynamic, Jampac and Hayhurst are jointly and severally liable for High–Tech's liability to the 1992 Plan.

### E. *Amount of Liability.*

Having concluded that High–Tech and related persons are responsible for financing certain of the benefits of the 1992 Plan, the Court must determine what amount is owed. Pursuant to 26 U.S.C. § 9721 (Subchapter D of the Coal Act), the Court is to apply the provisions of § 4301 of the Employee Retirement Income Security Act of 1974 ("ERISA") regarding withdrawal liability to any claim arising out of an obligation to pay health premiums under the Coal Act. Section 4301 of ERISA, 29 U.S.C. § 1451(b)

---

**6.** Dynamic has been owned in equal shares by James and Jane Hayhurst since April 15, 1987, when they each received 250 shares of the corporation. Because James Hayhurst owned 50 percent of Dynamic during 1992, the year High–Tech ceased to be in business, his interest in Dynamic is attributable to his wife pursuant to the tax code's spousal attribution rules relating to stock ownership under 26 U.S.C. § 52(a) and regulations promulgated thereunder. 26 C.F.R. § 1.1563–3 provides in pertinent part:

(i) Except as provided in subdivision (ii) of this subparagraph, an individual shall be considered

to own the stock owned, directly or indirectly, by or for his spouse ...

(ii) An individual shall not be considered to own stock in a corporation owned, directly or indirectly, by or for his spouse on any day of a taxable year of such corporation, provided that each of the following conditions are satisfied with respect to such taxable year:

(a) Such individual does not, at any time during such taxable year, own directly any stock in such corporation.

provides that a failure to pay withdrawal liability is to be treated in the same manner as a delinquent contribution. Civil actions to enforce delinquent contributions, defined in 29 U.S.C. § 1145, are governed by the general civil enforcement provisions, 29 U.S.C. § 1132. That section provides, in pertinent part:

(g) Attorney's fees and costs; awards in actions involving delinquent contributions

. . . . .

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

On April 6, 1995, the Trustees informed the Court that, as of April 1, the defendants owed $367,624.50 in delinquent monthly per-beneficiary premiums, $30,374.80 in interest, $73,524.90 in liquidated damages, and an undetermined amount of attorney fees. After April 1, the delinquent premiums increase by $13,590.26 on the 15th of each month and the interest accrues at the rate of $90.65 per day. Obviously, the total amount has increased since April 1, 1995 and the Trustees are

entitled to those additional amounts. High-Tech does not contest these figures. The Trustees have requested leave to submit an affidavit of attorney's fees and costs within thirty days of this Order, and such leave is granted.

## IV. *VESTA'S MOTION FOR SUMMARY JUDGMENT*

On December 24, 1984, Vesta and High-Tech entered into a Memorandum of Agreement in which High-Tech agreed to mine coal on contract from one of Vesta's mines in Pennsylvania. According to the agreement, Vesta would provide the necessary initial mining equipment, funds to improve ventilation, economic interest such as a lease in the mineral rights, and reimbursement of direct expenses plus an administrative fee of $20,000 per month during the start-up from December, 1984 to approximately April, 1985. High-Tech agreed to qualify to do business in Pennsylvania, obtain a UMWA contract and assume Vesta's obligations to its employees as successor to Vesta. It also agreed to hire salaried employees of Vesta as necessary and to pay for all labor and labor-related costs, including medical benefits and pension expenses.

Although mining at the Vesta site began with 110 workers, it never reached the expected production levels and closed after only eleven months and ten days. Vesta voluntarily continued to reimburse High-Tech for health benefits for retirees until it formally terminated all agreements with High-Tech on June 30, 1991. Between 1985 and 1987, Vesta also advanced $120,000 to High-Tech expressly so that the money could be placed in a medical insurance liability account to provide certain health care coverage required by the contract with the UMWA. High-Tech deposited $40,000 of that amount, but used the remainder for other business expenses. The UMWA eventually sued High-Tech [7] for the medical insurance money. That case was settled when High-Tech agreed to pay the retirees' medical insurance through the end of the 1988 NBCWA. To accomplish this, High-Tech and Dynamic ob-

---

**7.** There is some question as to whether Vesta was also sued, but the issue is not material.

tained a loan from Vesta,[8] but High–Tech made payments on the loan only through January 14, 1993, and there is an outstanding balance of $101,993.34 due from High–Tech and Dynamic, jointly and severally.

In its third-party complaint, High–Tech alleges that Vesta breached the 1984 Memorandum of Agreement by not reimbursing High–Tech for the monthly per beneficiary premium liability imposed by the Coal Act. High–Tech also argues that it was a mere shell or alter ego of Vesta which should take full responsibility for the premiums. Vesta has counterclaimed both on the $80,000 advance to High–Tech and also on the loan agreement in which both Dynamic and High–Tech agreed to be bound. It seeks summary judgment on all counts.

### A. Breach of Contract Claim.

■ High–Tech claims that Vesta's contractual obligation to reimburse the health benefit premiums arises from paragraphs 9(a) and 10(a) of the 1984 Memorandum of Agreement.

Paragraph 9(a) states in relevant part as follows:

Hi–Tech Collieries will provide and pay for all labor; labor-related costs such as FICA taxes, workmen's compensation, State and Federal unemployment compensation; black lung benefits; medical benefits; pension expenses; etc.; supplies; materials; electric power; etc.; to operate the mine.

Paragraph 10(a) of the Memorandum of Agreement states as follows:

Hi–Tech Collieries will be reimbursed by Vesta Mining Company for direct expenses of paragraph 9 above plus an administration of $20,000 per month during the start-up period from December, 1984 until approximately April, 1985.

■ Based on this language, High–Tech invites this Court to find that Vesta has a duty to reimburse it for all labor-related costs, including the monthly health benefit premiums imposed by the Coal Act. However, "a contract's language must be accorded its plain meaning and, where plain, the lan-

guage must be given full effect," *Moore v. Chesapeake & Ohio Ry. Co.*, 493 F.Supp. 1252, 1269 (S.D.W.Va.1980), quoting *Nisbet v. Watson*, 162 W.Va. 522, 251 S.E.2d 774, 780 (1979).

The clear language of this agreement precludes a finding that a duty to reimburse exists. The Coal Act premiums can in no way be described as start-up costs. Moreover, the language "approximately April 1995" establishes a closing date for reimbursement of the start-up costs. Although it is somewhat imprecise, the Court does not believe that the closing date can be extended indefinitely, and certainly not to the date of the passage of the Coal Act.

■ The Court also cannot find in the language of this contract the clear and definite language of indemnity that would establish the intention of the parties to indemnify against a specified loss or liability. As Vesta points out, the law in both Pennsylvania, where Vesta resides and where the contract was formed, and West Virginia, where High–Tech resides, is clear that contracts of indemnity are strictly construed and must show the specific intention to indemnify. *See Sellers v. Owens Illinois Glass Company*, 156 W.Va. 87, 191 S.E.2d 166, 169 (W.Va.1972); and *East Crossroads Center, Inc. v. Mellon Stuart Co.*, 416 Pa. 229, 205 A.2d 865 (1965). The Court cannot infer a contract of indemnity from the unambiguous language of this contract.

■ High–Tech suggests that the fact that Vesta continued to pay labor costs into 1991 evinces an intention to contract for indemnity. This continued payment, however, appears to have been a unilateral and voluntary act by Vesta, made, perhaps, to encourage High–Tech to reopen the mine. The payments were stopped on June 30, 1991 when Vesta formally terminated any and all agreements it had with High–Tech. This may have been a prescient act on the part of Vesta, as the Coal Act with its extraordinary costs was enacted slightly more than a year later. Perhaps in recognition of the inevitable, High–Tech paid its own retirees' health

---

**8.** High–Tech and Dynamic agreed to repay the loan in the amount of $5,000 per month at eight percent (8%) per annum interest. See discussion infra at subsection C.

benefits for a time and made no claim that Vesta should reimburse it.[9]

## B. Alter–Ego Status.[10]

■ High–Tech argues that it was constrained by Vesta in every aspect of the mining: that Vesta told it who to hire and who to lay off; that Vesta required the union contract and approved it before High–Tech could sign; that Vesta did all payroll accounting and cut the checks; and that Vesta gave it orders regarding the closing of the mine and never gave an accounting of the coal produced. According to High–Tech, it was never permitted to act independently under the contract and was excluded from the decision when Vesta closed the mine in 1988. Consequently, it contends that it was a mere shell, or alter ego, of Vesta which should be held primarily liable for the Coal Act premiums.

■ In determining whether an alter ego situation exists, the initial inquiry focuses on whether the same entity substantially controls both the old and the new employer after a transfer of business operations. Only if this substantial control is found to exist will the inquiry then turn to whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer relating to an elimination of its labor obligations. Absent either an initial finding of substantial control over both entities or a subsequent finding of reasonably foreseeable future benefit, there is no basis for a finding of alter ego status. *Alkire v. National Labor Rela-*

tions Board, 716 F.2d 1014 (4th Cir.1983). See also National Labor Relations Board v. McAllister Brothers, Inc., 819 F.2d 439 (4th Cir.1987).

■ Application of the alter ego doctrine requires an analysis of several factors, including common ownership, interrelation of operation, common management and centralized control of labor relations. *Walter N. Yoder & Sons, Inc. v. NLRB*, 754 F.2d 531 (4th Cir.1985), quoting *Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.*, 690 F.2d 489, 507 (5th Cir.1982).[11] An examination of the facts here, and in particular the undisputed relationship between Vesta and High–Tech, leads to the conclusion that High–Tech was not the alter ego of Vesta.

It is undisputed that High–Tech was incorporated specifically for the purpose of entering into the 1984 Agreement with Vesta. In that regard, James C. Hayhurst was initially approached by Stanley M. Sears, who had learned that Vesta was interested in engaging a contract miner. Sears and Hayhurst subsequently met with Vesta officials in Vesta's McMurray, Pennsylvania office to make a presentation to become a contract miner for Vesta. The original incorporators of High–Tech were Stanley Sears, James Hayhurst and Jane Hayhurst, and the original shareholders were Stanley Sears and Jane Hayhurst. The Hayhursts, however, subsequently bought Sears' shares, and Jane Hayhurst became the sole shareholder. The directors and officers of High–Tech were, vari-

---

**9.** Vesta relies on the similarities between the facts in this case and the facts in *Superior Pocahontas Coal Co. v. Island Creek Coal Co.*, 840 F.2d 11 (4th Cir.1988). In that decision, the Fourth Circuit upheld entry of summary judgment in favor of Island Creek against Superior, the contract miner for one of Island Creek's mines. Although Island Creek and its successor, Epoxy, paid required pension benefits during the mining activities, they did not make the payments when the mining contract terminated and mining ceased. The Court found that they were not liable for the withdrawal liability assessment imposed on Superior by the Trustees of the UMWA 1950 and 1974 Pension Trusts, as the costs of the assessment did not derive from the mining contract. The *Superior* case is unpublished and, thus, is not controlling authority. It is, however, persuasive and the findings above are consistent with it.

**10.** Vesta argues that the court should not consider this theory because it was not raised in the third-party complaint, but only in the response to Vesta's motion for summary judgment. However, a similar theory was raised in the answer to the complaint, and was the gravamen of High–Tech's defense to the trustees' claim against it.

**11.** In the *Alkire, McAllister Brothers,* and *Yoder* cases, a third-party (the National Labor Relations Board or a union) was attempting to assert liabilities against one or both entities alleged to be alter egos of the other. None of these cases involved situations, as here, where the claim for relief was being alleged by one member of the claimed alter ego relationship against the other member.

ously, Jane Hayhurst, Stanley Sears and James Hayhurst. Vesta never has been a shareholder in High–Tech; nor has High–Tech ever had any common officers, directors or shareholders with Vesta. Since there was never any common ownership between it and Vesta, High-tech has failed to establish the first required factor for finding alter ego status.

This finding notwithstanding, High–Tech argues vehemently that it was the alter ego of Vesta because Vesta told it that it had to hire certain employees. Vesta, however, was doing nothing more than fulfilling its obligations under the 1984 NBCWA, which required, in Article IA, Section (h), that Vesta would not lease, sublease or license out coal mining operations [12] covered by the NBCWA unless the lessee or licensee agreed that all offers of employment would first be made to Vesta's classified, laid off employees at the Vesta Mine. Thus, in its 1984 Agreement with Vesta, High–Tech obligated itself to assume Vesta's obligations as a successor "for hiring, panel rights, etc., of the employees of Vesta Mining Company;" and, in its Agreement with the UMWA, High–Tech agreed to be a successor to Vesta's obligations, which included the hiring of employees laid off by Vesta.

Furthermore, the conduct of the parties after High–Tech began its mining operations demonstrates clearly that Vesta did not exercise the degree of control or supervision over High–Tech sufficient to warrant even an inference of alter ego status. Specifically, Hayhurst has admitted that the employees hired by High–Tech in or about February of 1985 were placed on High–Tech's payroll and supervised by him. As far as he was concerned, once those individuals were hired by High–Tech, they were accountable only to High–Tech.

Both the superintendent and Hayhurst were at the mine site on a daily basis, and Hayhurst was High–Tech's day-to-day manager. Significantly, no employee of Vesta was at the mine site on a daily basis. Vesta's personnel appeared only intermittently, for specific purposes. No Vesta employee directed High–Tech's foremen or classified employees in any respect. Moreover, High–Tech handled all of its own labor relations matters, and Vesta never directed Hayhurst who High–Tech should discipline or discharge.

It is also significant that, very early in the contractual relationship, Hayhurst informed two employees of Vesta, George Pizoli and Roger Wood, that they must talk to him and not to any other employees of High–Tech if they wanted something. Both men complied with this directive. This is not typical of one who is the alter ego of another; rather, it is the action of one entity asserting complete independence from another entity.

Numerous other factors also underscore the independence between High–Tech and Vesta. They include:

1) Day-to-day decisions as to the amount of coal to be mined were made by High–Tech's superintendent and section foremen. No employee of Vesta ever dictated to High–Tech how much coal to mine on any particular day;

2) High–Tech's superintendent made all overtime decisions on a day-to-day basis, and decided who would work on what particular shift;

3) The office of High–Tech was located in Fairmont, West Virginia, while Vesta's office was in McMurray, Pennsylvania;

4) High–Tech employed a separate individual at the Fairmont office who handled all administrative tasks. Although payroll services were performed for High–Tech by Pennsylvania Mine Services, after the payroll was calculated the information was sent to High–Tech which would issue the checks and perform any other remaining payroll-related tasks. Hayhurst signed all High–Tech checks;

5) High–Tech filed its own federal and state income tax forms, payroll tax forms and withholding forms, and employed a separate accounting firm located in Kingwood, West Virginia;

**12.** The parties do not dispute that it is well recognized in the coal industry that a contract mining arrangement constitutes a licensing out of coal mining operations.

6) The purchasing of all supplies, parts and materials for the Vesta Mine was performed by High–Tech;

7) Liability insurance payments were made by High–Tech, and royalty payments to the UMWA Trust Funds were computed and made by High–Tech in its own name;

8) High–Tech had a separate Mine Safety and Health Administration (MSHA) number for its operations, and MSHA inspections were made with High–Tech employees, not Vesta employees;

9) High–Tech maintained its bank accounts, books and records separately from those of Vesta;

10) No officer, director or employee of Vesta had access to any bank accounts of High–Tech or to the books and records of High–Tech;

11) Assets of High–Tech were never combined with or commingled with the assets of Vesta; and

12) High–Tech was reimbursed for all costs and also received a generous management fee while operating the Vesta Mine.

Finally, except through their commercial agreement, Vesta and High–Tech were not in any way related. The ownership and controlling interests of the two entities were completely different. High–Tech's own documents represent that it was a part of a controlled group of corporations, including Dynamic Recovery, Hayhurst & Hill, Canon Coal Corporation and Jampac, Inc. Nowhere is Vesta listed as being a part of the same control group, or as otherwise being controlled by or related to High–Tech.

Notwithstanding the fact that High–Tech has failed to hurdle the initial requirement of substantial control over both entities, Vesta also posits that High–Tech cannot prove any reasonably foreseeable future benefit, the second prong of the alter ego test. As stated by the Fourth Circuit, *if* substantial control exists (which here it does not), alter ego status depends on the further finding that a transfer was accomplished because of a reasonably foreseeable future benefit accruing from the action. *Alkire NLRB*, 716 F.2d at

1019. In this case, Vesta and High–Tech entered the 1984 Agreement in December of 1984, and High–Tech's mining operations at the Vesta Mine occurred in 1985 and 1986. The monthly per beneficiary premiums sought by the plaintiffs under the Coal Act, however, did not even arise until 1992, six years after High–Tech's last mining activity. From these facts, it strains credulity to suggest that, in 1984, Vesta could have expected or intended to avoid any obligations under, or to derive any benefit from, the Coal Act enacted eight years later.

High–Tech has failed to establish a genuine issue of material fact regarding the existence of an alter ego status between itself and Vesta in this case. The evidence is overwhelming that High–Tech always was an independent business entity that acted on its own behalf and for its own business interests.

### C. *Vesta's Counterclaim Against High– Tech and Dynamic.*

Vesta has also moved for summary judgment against High–Tech and Dynamic on both counts of its counterclaim which alleges that High–Tech has not fully repaid Vesta for advances or loans Vesta made to High–Tech in two separate transactions.

In Count I, Vesta seeks repayment for $80,000 of the $120,000 advanced to High–Tech specifically for placement into a VEBA Fund to provide health care coverage to certain eligible individuals. Unknown to Vesta, High–Tech diverted the $80,000 to other uses.

In Count II, Vesta seeks to recover the unpaid balance of an April 10, 1992 loan it made to High–Tech and Dynamic so that High–Tech could provide health care benefits to eligible retirees under its IEP during the balance of the 1988 NBCWA. Although both High–Tech and Dynamic agreed to repay the loan in payments of $5,000 per month, at 8% annual interest, payments to Vesta ceased on or about January 14, 1993.

During his deposition, James Hayhurst admitted that Vesta's loan had not been fully repaid. Now, however, in its response to Vesta's motion for summary judgment, High–Tech argues that Vesta is not

entitled to summary judgment under *both* Count I and Count II of its counterclaim because the loan referenced in Count II was made to assist High–Tech replace the original $80,000 it diverted from the VEBA Fund referenced in Count I. Vesta concedes that it is not entitled to judgment under both counts.

As between Count I and Count II of Vesta's counterclaim, the Court concludes that entry of judgment on Count II is more appropriate inasmuch as that transaction resulted in additional and higher loans being made because of High–Tech's previous diversion of the original $80,000 advanced to it by Vesta.

High–Tech also asserts that there is a dispute concerning the amount it actually owes Vesta. During Hayhurst's deposition, however, he acknowledged that High–Tech had ceased making payments to Vesta in January 1993, and admitted High–Tech's continuing obligation to repay Vesta:

> ... and I owe Vesta—I don't know what it is. *You guys have got interest and penalties and stuff* ... so I'm not going to dispute that I owe the money to Vesta. (Emphasis added.)

It therefore appears that Hayhurst has deferred to the calculations as set forth in Vesta's counterclaim.

█ High–Tech contends that the Loan Agreement of April 10, 1992 was signed under "duress." To support this contention, however, High–Tech offers only the bald assertion that Vesta presented it with a "take it or leave it" proposition.

The law of duress, as it applies to the enforcement of business contracts, is similar in both Pennsylvania and West Virginia. Courts in these two states have recognized the defense of duress in the business setting only in the limited circumstance where a plaintiff involuntarily enters into a transaction as the result of unlawful threats, or wrongful, oppressive, or unconscionable conduct on the part of a defendant, which leaves the plaintiff no reasonable legal remedy available but to acquiesce. *See Temp–Way Corp. v. Continental Bank*, 139 B.R. 299 (E.D.Pa.1992), *affirmed*, 981 F.2d 1248 (3d Cir.1992); *Machinery Hauling, Inc. v. Steel of West Virginia*, 181 W.Va. 694, 384 S.E.2d 139 (1989).

█ It is quite clear that the refusal by one party to enter into a business relationship with another unless the other party enters into a contract does not constitute duress so as to excuse performance under the contract. *Gummed Tapes (PTY) Limited v. Miller*, 155 F.Supp. 267 (D.C.Pa.1957). Furthermore, duress is not shown simply because one party to a contract has driven a hard bargain, or because the market or other conditions now make the contract more difficult to perform, or because financial circumstances caused one party to make concessions. Similarly, the fact that one enters into an agreement because of a need for money at the time does not constitute duress sufficient to avoid the contract. *Harrison v. Fred S. James, P.A. Inc.*, 558 F.Supp. 438 (D.C.Pa. 1983); *Temp–Way Corp. v. Continental Bank, supra; In re: St. Mary Hospital*, 155 B.R. 345 (E.D.Pa.1993); *Machinery Hauling, Inc. v. Steel of West Virginia, supra.*

█ Equally important, a claim for duress will not be recognized where a party has had an opportunity to consider, reflect and consult with counsel before entering into a contract, or where an alternative legal remedy was available. *Wahsner v. American Motors Sales Corporation*, 597 F.Supp. 991 (D.C.Pa.1984); *Temp–Way Corp. v. Continental Bank, supra; Three Rivers Motors Company v. Ford Motor Company*, 522 F.2d 885 (3d Cir.1975); *Central Acceptance Corporation v. Nash Bluefield Motor Company*, 104 W.Va. 174, 139 S.E. 654 (1927); *National Auto Brokers Corp. v. Aleeda Development Corp.*, 364 A.2d 470, 243 Pa.Super. 101 (1976).

Hayhurst's deposition testimony convinces the Court that the April 10, 1992 Loan Agreement was not the result of any legally cognizable "duress." First, he admitted that he approached Vesta and requested the loan. Thus, Vesta did not force the transaction on him. Second, he understood that High–Tech had to pay the health care premiums for its own retirees and that Vesta offered to loan the money to do so upon execution of an agreement evidencing and securing the loan.

Hayhurst further admitted that he negotiated the loan agreement with Vesta over a period of two to three months and had the opportunity to consult with an attorney if he wished to do so. Nor did Vesta threaten or force him to sign the agreement. Finally, he acknowledged his belief that litigation by the UMWA would have ensued had he not entered into the Loan Agreement.

From these admissions, it is clear that no element of duress existed in the loan transaction. Hayhurst sought out Vesta and requested the loan. The mere fact that High-Tech needed the money at the time does not support a claim of duress. There is no shred of evidence that anyone forced Hayhurst, High-Tech or Dynamic to enter into the agreement. They always had the option to consult with counsel or to reject the loan transaction in its entirety. That possibility that they may have been sued is a legally inadequate basis to impute duress. Moreover, Hayhurst testified that he believed Vesta had tried to help High-Tech by making the loan, that he harbored no animosity toward Vesta and that the failure to fully repay the loan occurred because "things got continually worse for me and they've been bad ever since. So, we're behind."

The failure of High-Tech and Dynamic to repay the loan resulted from subsequent economic conditions, not duress in the first instance. Under the well-established law of duress, High-Tech and Dynamic, therefore, have failed to establish a basis for avoiding their obligations under the Loan Agreement.

## V. CONCLUSION

For the reasons set forth above, the Court concludes that High-Tech is liable to the Trustees for the monthly health benefit premiums under the Coal Act, and that Dynamic, Hayhurst, Canon and Jampac are jointly and severally liable for those premiums as related parties. The defendants are further jointly and severally liable for interest, liquidated damages and attorneys' fees.

High-Tech is not entitled to reimbursement from Vesta for the premiums or other costs under either a contractual or alter ego theory. Moreover, it is liable to Vesta for monies due on the April 10, 1992 loan agreement.

## ORDER

In accordance with its Memorandum Opinion, the Court ORDERS as follows:

1. The plaintiffs' motion for summary judgment (Docket No. 21) is hereby GRANTED, and the motion for summary judgment of the third-party defendant, Vesta Mining Company (Docket No. 27) is hereby GRANTED;

2. Judgment is entered for the plaintiff trustees in the amount of $471,524.20, and such other amounts as have accrued since April 1, 1995 by operation of law.

3. The Trustees shall have thirty days from the date of this order to submit an affidavit of attorney's fees and costs.

4. Judgment is entered for the third party defendant Vesta Mining Company in the amount of $101,993.34 with additional interest at the rate of 8% per annum from February 1994 until paid.

5. This action is DISMISSED with prejudice and the Clerk is directed to remove it from the docket of the Court and to transmit copies of the Court's Memorandum Opinion and this Judgment Order to counsel of record herein.