Michelle L. D'ALESSANDRO, Plaintiff,

v.

Norris Lewis WESTALL; City of Marion;
Bob R. Haynes, In his capacity as Sher-
iff of McDowell County; and United
States Fidelity and Guaranty Company,
Maryland Corporation, Defendants,

and

CITY OF MARION, Defendant
and Third–Party Plaintiff,

v.

McDOWELL COUNTY, Third–
Party Defendant,

and

Alana Marie WILLIAMS, Third–Party
Defendant and Fourth–Party
Plaintiff,

v.

Bob R. HAYNES, in his capacity as Sher-
iff of McDowell County, and United
States Fidelity and Guaranty Company,
a Maryland Corporation, Fourth–Party
Defendants.

Civ. No. 4:95CV70.

United States District Court,
W.D. North Carolina,
Shelby Division.

March 24, 1997.

Joseph P. McGuire, M. Charles Cloninger, McGuire, Wood & Bissette, P.A., Asheville, NC, for Michelle L. D'Alessandro.

William H. McElwee, III, Christopher D. Lane, McElwee & McElwee, N. Wilkesboro, NC, for City of Marion.

Norris Lewis Westall, Marion, NC, pro se.

Michael G. Gibson, Dean & Gibson, Charlotte, NC, William C. Morgan, Jr., Michael B. Brough & Associates, Chapel Hill, NC, for Bob R. Haynes, U.S. Fidelity and Guaranty Co. and McDowell County.

Walter L. Hart, IV, Bailey, Patterson, Caddell, Hart & Bailey, Charlotte, NC, Steven D. Cogburn, Cogburn, Cogburn, Goosmann & Brazil, Asheville, NC, for Alana Marie Williams.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the motions of several parties.

Defendants Bob R. Haynes, sued in his capacity as Sheriff of McDowell County, and

United States Fidelity and Guarantee Company filed a motion for summary judgment February 3, 1997, asserting that the actions of officers of the McDowell County Sheriffs Department ("MCSD") did not constitute gross negligence. Likewise, Defendant City of Marion moved for summary judgment January 31, 1997, contending that its officers were not grossly negligent.[1] Plaintiff D'Alessandro responded to the Defendants' motions on February 17, 1997. Fourth–Party Plaintiff Williams filed a memorandum opposing the motions on February 18, 1997.

Third–Party Defendant Williams filed for summary judgment January 31, 1997, "on all claims of negligence against her." Third–Party Plaintiff City of Marion filed its memorandum opposing summary judgment on Williams' negligence February 14, 1997.

## I. INTRODUCTION

On the night of January 14, 1993, in Marion, North Carolina, law enforcement officers of the City of Marion and the McDowell County Sheriff's Department participated in an extended chase of a red 1988 5.0 liter Mustang.[2] Plaintiff's February 8, 1993 Response to Grievance of Marion Police Chief T.B. Pruett to J. Earl Daniels, City Manager, *attached as* Exhibit 7 *to* Defendants/Fourth–Party Defendants Haynes and United States Fidelity and Guarantee Company Motion for Summary Judgment, filed February 3, 1997 (hereinafter, all depositions and exhibits are attached to the Defendants' summary judgment motion unless otherwise indicated). The chase involved a total of nine law enforcement vehicles chasing a Mustang vehicle that several times exceeded 100 miles per hour ("m.p.h."). The pursuit ended in a collision resulting in injuries to the Plaintiff and a passenger in a Nissan vehicle struck by the Mustang. Also injured was Andrew Williams, an infant that law enforcement officers knew from the beginning of the chase to

---

1. This Court heartily recommends that the City of Marion increase its footnote font in filings from the infinitesimal four-point currently favored.

2. The McDowell County Sheriffs Department officers (referred to as "Deputies" in this Memorandum) involved in the chase were Deputies Smith, Snider, Gillstrap, Macopsen and Earle. The City of Marion officers (referred to as "Officers") involved were Huskins, Rumfelt, Arrowood and Allen. Trooper Randy Patterson of the North Carolina Highway Patrol also took part, but is not a party to this lawsuit.

be riding in the Mustang. Andrew was found in his child safety seat amidst a field some 100 feet from the crash.

The events occurring between the initiation of the chase and its conclusion are not clear. The Court has before it depositions and statements of law enforcement officials, which at times are conflicting. The Court also has before it radio traffic transcripts recorded from a communication system that cancels out competing signals and has dead zones where signals can neither be transmitted nor received. Nevertheless, certain facts are undisputed. For example, the pursuit policies of the Sheriffs Department and the City of Marion are clear, as is the fact that the persons involved in the chase violated many of their provisions.

At the summary judgment stage, the disputed and undisputed facts justify sending this case to a jury, both as to the negligence of Williams and the gross negligence of the involved law enforcement agencies.

For the sake of judicial economy, the Court will consider the motions of the defendant law enforcement authorities together and Williams' summary judgment motion separately.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict in favor of the non-moving party. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

The moving party has the initial burden to show a lack of evidence to support its opponent's case. *Shaw, supra (citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). This showing does not require the moving party to prove the absence of a genuine issue of material fact but only note its absence. *Holland*

*v. High–Tech Collieries, Inc.,* 911 F.Supp. 1021, 1025 (N.D.W.Va.1996) (citing *Celotex, supra* ). If this showing is made, the burden then shifts to the non-moving party, who must convince the Court that a triable issue does exist. *Shaw, supra.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* A "mere scintilla" of evidence will not suffice to defeat summary judgment. *Id.*

In considering the facts of the case for the purposes of a summary judgment motion, the Court views the pleadings and materials presented in a light most favorable to the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where facts are in legitimate dispute, such disputes are resolved in favor of the non-moving party. *Id.,* at 587, 106 S.Ct. at 1356; *Nguyen v. CNA Corp.,* 44 F.3d 234, 237 (4th Cir.1995). Because Williams' motion will be dealt with separately, the factual background set out below is cast in a light appropriate for considering the twin summary judgment motions of law enforcement.

## III. FACTUAL BACKGROUND

Deputy Greg Snider of the McDowell County Sheriffs Department initiated the chase of Defendant Norris Westall sometime after 11:30 p.m. on the night of January 14, 1993. Snider had come upon a red Mustang stopped in the middle of a public road with its hazard lights flashing. Deposition of Gregory Fletcher Snider at 45. As did two other Deputies that evening, Snider had with him a young, non-commissioned "Explorer" scout who was riding with the officers as part of a program to introduce prospective Deputies to law enforcement. *Id.,* at 50; Deposition of Randall Lee Smith at 62. Snider pulled up behind the vehicle and activated his warning lights. Deposition of Alana Marie Williams at 53.[3] Alana Williams (Fourth–Party Plaintiff) got out of the Mustang, came back to Snider, and explained that Westall (Defendant) was in her car and would not get out. *Id.,* at 53. Williams had left the key in

---

**3.** Snider claims he did not activate a blue light until later, but other lights such as grille strobes and flashers could have been activated when he stopped his car in the middle of traffic.

the ignition. Westall, who had been riding in the passenger seat, got into the driver's seat and began to pull away. Williams Deposition at 53; Snider Deposition at 47. Williams pleaded for Deputy Snider to stop the car because the driver had her baby, Andrew. *Id.* Westall sped away; Snider pursued with his blue lights activated. Snider Deposition at 48. Snider next saw the Mustang sitting in a bay of a nearby car wash. When Snider got out of his car and approached on foot, Westall again fled in the Mustang. *Id.,* at 50.

Snider advised that he was involved in hot pursuit of the Mustang over a radio system shared by the MCSD and the City. While no McDowell County unit ever made—and no Marion unit ever heard—a formal request for assistance in the pursuit, both Marion and McDowell County units were involved in the subsequent chase of Westall through the Marion city limits. Different law enforcement units traded off the lead slot behind Westall as some cars experienced brake fade and Westall evaded others with his sharp turns and end-runs around vehicular roadblocks.[4]

Westall avoided one roadblock by cutting a corner through a yard, and Deputy Snider crossed the same yard in pursuit. Snider Deposition at 65–66. City of Marion Officer Arrowood parked on a side street intending to stay out of Westall's way. Deposition of Nora Lee Arrowood at 9–10. In an area typically zoned 35 m.p.h., Westall drove by at 60 to 70 m.p.h., followed by Deputy Snider travelling at the same speed. Snider Deposition at 63; Arrowood Deposition at 10–11.

Minutes later, Officer Arrowood spoke with Alana Williams and learned that Westall was the driver of the Mustang, Arrowood transmitted the information over the radio. Arrowood Deposition at 12–13. Arrowood also relayed that the baby in the car was 10 months old. *Id.,* at 15.

Radio transcripts indicate that Sheriff Department Lieutenant Smith[5] transmitted several messages after Westall's identity was first made known telling County units to back off. *Id.* Soon thereafter, when the City car trailing Westall lost sight of him, Officer Huskins ordered the chase aborted for City units. Handwritten Transcription at 10, *attached as* "Plaintiff's Exhibit 19" (hereinafter "Handwritten Transcript") (see Exhibit 5 *attached to* Plaintiff's Opposition to Summary Judgment for officer radio code designations). Marion Officer Rumfelt acknowledged the abort command. *Id.* Sometime soon after, while Westall was still out of sight, came Arrowood's statement that Westall was positively the driver and that the car had a ten-month old passenger. *Id.,* at 14. Sheriffs Lt. Randy Smith then cancelled the chase for all County units, stating that he "was not aware of that." *Id.*

Officer Huskins terminated the City's participation in the chase because Westall was gone from sight and continued pursuit put the child in the Mustang at risk. Huskins Deposition at 48–49. (As Huskins told Deputy Smith, he did not "want to kill a baby to catch a fool." *Id.,* at 48.) Deputy Smith called off the chase due to several concerns: the risk to the child riding in the Mustang, the fact that he and Snider were engaged in pursuit with Explorer scouts in their vehicles; the likelihood of being able to apprehend the locally known fugitive through warrants at his home; and the risk to pedestrians and other motorists. See Smith Deposition at 48, 50, 62, 64. Officer Rumfelt understood from radio traffic that the chase was cancelled in part because a child was in the car and because Westall was a local resident who could be apprehended later. Deposition of Brent Allen Rumfelt at 18, 24.

After the cancellations, Deputy Macopsen radioed in that the Mustang had just passed

---

4. Radio traffic indicates that at some point during this phase of the chase Westall reached speeds in excess of 100 m.p.h. See McDowell County Sheriff Department Transcript, at 6 (unpaginated), *attached as* Exhibit 10 to Plaintiff's Opposition to Summary Judgment, filed February 17, 1997 (hereinafter "Transcript").

5. On the night of the chase, each law enforcement agency had a Lieutenant commanding the actions of its agents in the field. Lt. Randy Smith commanded the Deputies. The City Officers were under the command of Lt. Andre Huskins.

his house at a very high speed with a patrol car right behind it *Id.,* at 16. (The pursuing vehicle was operated by Officer Huskins, though no one save Huskins knew this at the time.) Deputy Smith again stated his view that since there was a 10–month–old in the car, officers should simply get warrants for Westall's arrest. *Id.,* at 15.

Several minutes after the cancellation, Officer Huskins reported that Westall had almost hit him and was fleeing from a BP gas station heading westward out Highway 70. See Snider Deposition at 68–69; Handwritten Transcript at 18. Huskins radioed that there was only one person in the Mustang. Transcript at 8; Handwritten Transcript at 19. Huskins admits that he was not positive that Williams was not in the car and that, in fact, he could well have been since Huskins had no chance to view the interior of the vehicle. Deposition of William Andre Huskins at 204, 205, 195.

Instead of radioing for back-ups when he first saw the Mustang at the BP station, Huskins had immediately swerved into the gas station, pulled in front of the Mustang and quickly gotten out of his patrol car. Huskins Deposition at 84–85. Westall ran from the gas pump and jumped in the Mustang. *Id.,* at 85. Huskins leaned his upper torso through the car's open window and attempted to stop the driver by wrapping an arm around him and pinning the suspect's head with the side of his own. *Id.,* at 86–88. The police officer claims to have held on to Westall as he started the car and began driving away, resulting in Huskins' being dragged some 20 feet. *Id.,* at 89–90. After Huskins let go, Westall left at high speed. *Id.,* at 93.

Huskins then made his radio transmissions. While there was no order specifically countermanding the earlier pursuit cancellation, at least one officer concluded from subsequent radio traffic that the chase had resumed. Rumfelt Deposition at 26. Huskins entered his car and pursued the Mustang.

The officers' accounts differ as to what happened next. Officer Huskins states that he drove westward out Highway 70 at a speed of 30–35 m.p.h "just following" Westall, who was travelling quite fast. Huskins De-

position at 99. Upon hearing Huskins' radio traffic, however, Deputies Snider and Smith sped westward to follow Huskins and Westall on Highway 70, reaching a speed of 65 m.p.h. by the time they passed Walmart in town, following Huskins out Highway 70 at a distance of 250 feet. Snider Deposition at 79, 80, 85. Upon hearing radio traffic that led him to think a chase was underway, Deputy Earle likewise headed westward on Highway 70, Earle Deposition at 27, and saw Deputy Smith's car going that way in front of him. *Id.,* at 102.

Huskins, the lead law enforcement vehicle travelling west, now saw Westall pass him heading in the opposite direction. Huskins states that he called the information in and turned around. Huskins Deposition at 102. Westall also passed the westbound Snider and Smith, both of whom had their lights activated. Snider Deposition at 84. After Huskins turned around he saw two county vehicles, belonging to Deputies Snider and Smith, turn around in front of him and chase Westall with their lights activated. Huskins Deposition at 104–05. According to Snider, however, he and Deputy Smith stopped, let Huskins pass through, then turned around to follow. Snider Deposition at 84. Deputy Smith claims to have never seen Huskins at all, neither while travelling west, during the time he was turning around, nor when he began travelling east. Smith Deposition at 69. Deputy Snider claims he was acting not to pursue but only in a "support" role. Snider Deposition at 86–87. He estimates the eastbound Westall passed him travelling in excess of 100 m.p.h. *Id.,* at 82.

Deputy Earle, upon hearing Huskins' message that Westall was heading back east, had turned around and situated himself in a merging lane, facing town, with his blue lights and sirens on. Earle Deposition at 27–28. As Westall approached, Earle accelerated into the highway in attempt to slow him down; Westall went into the oncoming traffic lane and sped by him in excess of 100 m.p.h. *Id.,* at 29, 32. Earle may have initiated his "rolling roadblock" at the instruction of Deputy Smith. *Id.,* at 73–75. Earle thought the suspect was being chased for leaving the scene of a domestic squabble, *id.,* at 46, and

understood that Smith's command to abort the chase (which he heard) should be binding upon him. *Id.,* at 85.

When he pulled out into the road to obstruct the 100 m.p.h.-travelling Westall, Earle could see the blue lights of Officer Allen at the intersection up ahead. *Id.,* at 82. Officer Allen, stationed west of the Highway 70 and 221 Bypass intersection, saw blue lights several hundred feet behind Westall's vehicle as the Mustang approached. Allen Deposition at 52. With his own blue lights activated and facing east, Allen waited until Westall passed him and then accelerated onto the road after him. *Id.,* at 26, 35. Officer Allen still believed that a baby was in the car. *Id.,* at 36. Officer Rumfelt saw Westall travelling into the commercial area at a speed of at least 100 m.p.h., pursed by three cars with their blue lights flashing. Rumfelt Deposition at 28.

Two other law enforcement vehicles were closer to the intersection of Highway 70 and the Bypass, both with their lights activated. *Id.,* at 31. Officer Arrowood was positioned at the BP Station. Arrowood Deposition at 20. Deputy Gillstrap was located at the Walmart, having blocked off the parking lot entrance so that no cars would leave and collide with the now inbound Mustang. Gillstrap Deposition at 24. Gillstrap saw another Marion City police unit, its blue lights activated, following the Mustang at a distance of 750 feet. *Id.,* at 28, 33. As had Deputy Earle and Officer Allen before him, Deputy Gillstrap pulled out onto Highway 70 with his blue lights flashing and was entering the roadway when the collision occurred. *Id.,* at 29, 30. He estimates Westall's speed coming into the intersection to be in excess of 100 m.p.h. *Id.,* at 27.

The intersection of Highway 70 and the 221 Bypass is well-trafficked even at night. See Rumfelt Deposition at 35, 36. At the time of the collision, the general risk of a collision in the intersection between the absconding Westall and other traffic was high. *Id.* The collision occurred when D'Alessandro's white Nissan, travelling north on the 221 Bypass under a green light, was struck by the east-bound Mustang running the red light on Highway 70. Arrowood Deposition at 19.

All officers have acknowledged that the chase posed a danger to the involved officers, to the public, to the Explorer scouts riding shotgun with the Deputies, to Westall and to the child strapped into the Mustang. Deputies Earle, Snider and Gillstrap thought it was clear that Westall was determined not to be caught. Earle Deposition at 47; Snider Deposition at 94; Gillstrap Deposition at 63. As the above narrative indicates, Westall was determined to elude capture and he possessed the means to do so. Westall increased his speed when pursuing vehicles closed on him, Rumfelt Deposition at 57, and slowed considerably when law enforcement was out of sight (e.g., at the BP station). Westall's actions convinced Deputy Gillstrap that the Mustang would not stop "unless it gave out of gas or hit something." Gillstrap Deposition at 63.

The communication system used by the officers was old and flawed such that contact was patchy and simultaneous signals went unheard. Because only one frequency could be used by the different departments, synchronous radio traffic resulted in messages cancelling each other out and becoming partially or wholly inaudible. Rumfelt Deposition at 54. This problem was especially pronounced during emergencies, when radio traffic is particularly heavy. See, e.g., Gillstrap Deposition at 49. Officers recognized this to be a long-standing problem in need of remedy. Rumfelt Deposition at 56. At least one officer involved in the chase had additional problems with his individual radio cutting in and out. *Id.,* at 36.

In conducting the chase, officers of both departments violated a wide variety of applicable rules of procedure. The Marion "Hot Pursuit" rule violations apparently included: initiating pursuit without articulated justification (e.g., evidence that a serious felony had taken place, that the driver presented a clear and immediate threat to the safety of other motorists, or that the need for immediate apprehension outweighed the danger created by hot pursuit); failing to use both audible and visual emergency signals at all times during pursuit; failing to notify the

communications center that Marion Police units were initiating involvement in the pursuit and provide reasons for that initiation; filing to continually question whether the seriousness of the crime (the crime *before* the failure to stop) justified continuing the pursuit; failing to terminate pursuit upon determination of the driver's identity; failing to terminate where pursuit would be futile; failure of assisting units to avoid intercepting the path of an oncoming high-speed vehicle; boxing-in or heading off where the use of deadly force would not be authorized; duplicating reckless driving maneuvers; "caravaning"; and joining another agency's pursuit where not specifically authorized. City of Marion Police Department Policy and Procedure Letter, July 15, 1988, *attached as* "Plaintiff's Exhibit 2."

The McDowell County "High Speed Pursuit/Chase" rule violations included: failing to evaluate risk of pursuit as compared to the underlying crime on a continuing basis; failing to notify Telecommunicator of pursuit (once re-initiated), the reason for pursuit, and the offense charged; entering into chase initiated by another officer where not specifically requested to do so; involving more than one vehicle in direct pursuit at a given time; failing to notify Telecommunicator of roadblocks; setting a roadblock in a manner inconsistent with the principles governing the use of deadly force; and entering into pursuit with non-sworn personnel in the vehicle. McDowell County Sheriffs Department High Speed Pursuit/Chase Standard Operating Procedures, *attached as* "Plaintiff's Exhibit 4."

## IV. DISCUSSION

### A. Williams' Summary Judgment Motion on Negligence

Third–Party Defendant Williams urges summary judgment on the City of Marion's Third–Party Complaint, filed April 19, 1995. In that Complaint, Marion contends Williams' negligence was "primary and active and was the proximate cause of D'Alessandro's injuries and damages" while the actions of Marion, even if grossly negligent, were only a "secondary and passive" cause. Mar-

ion seeks either indemnification or contribution.

### 1. Indemnification

■ Indemnification is an equitable right under which the entire loss is shifted from a tortfeasor who is only technically or passively at fault to another who is primarily or actively responsible. In North Carolina, the common law right to indemnification is available to a passively negligent tortfeasor as against an actively negligent tortfeasor. *Edwards v. Hamill*, 262 N.C. 528, 138 S.E.2d 151 (1964). In this case, however, the City of Marion will be held liable for the Plaintiff's damages *only* if found to have acted with gross negligence. Because gross negligence is a greater quantum of fault than passive negligence, see *Gray v. Small*, 104 N.C.App. 222, 408 S.E.2d 538 (1991), *aff'd*, 331 N.C. 279, 415 S.E.2d 362 (1992), if the City's gross negligence is found to have caused the Plaintiff's injury, it could not also be found to have been passively negligent. Consequently, the very scenario that would give rise to the City's indemnification claim—its liability for gross negligence—undercuts that claim's viability. Cf. *Anderson v. Robinson*, 275 N.C. 132, 136, 165 S.E.2d 502, 505 (1969) (barring party who would *only* be liable for active negligence from seeking common law indemnification). The City of Marion's indemnity action will therefore be dismissed for failing to state a claim on which relief could be granted. See Fed.R.Civ.P. 12(b)(6).

### 2. Contribution

■ The City's claim against Williams under the North Carolina Uniform Contribution Among Tortfeasors Act, N.C. Gen.Stat. § 1B, cannot be dismissed so easily, for in it the City seeks a *pro rata* contribution from Williams rather than having her assume all liability. The Contribution Act allows for actions by a joint-tortfeasor who has paid more than her *pro rata* share of a common liability. Determining the various *pro rata* shares involves an examination of fault not dissimilar to that undertaken in cases where comparative negligence is at issue. Accordingly, a party's gross negligence would not appear to preclude its collecting contribution

from a joint tortfeasor, insofar as that collection accords with the relative contribution of each party's negligence to the Plaintiff's injuries. Cf. *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962) (abolishing distinction between gross and ordinary negligence in comparative negligence context).

■ Thus the City's claim is entitled to survive summary judgment if the facts (including properly contested facts) seen in a light most favorable to the non-moving Plaintiff could lead a rational jury to conclude that Williams was negligent and that her negligence proximately caused the Plaintiff's injury. So viewed, the facts do lead to that conclusion. Williams knew or should have known Westall to be in an agitated and reckless frame of mind: he refused to leave the car, threatened to punch a hole through the dash to the engine, and, prior to Snider's arrival, repeatedly yanked up the emergency brake on a crowded street, putting himself, Williams, her child and other motorists in danger. See Williams Deposition at 49–53. Williams understood Westall to be upset about an impending stint in prison. *Id.,* at 48. Despite his agitated, volatile, reckless temperament, she left Westall and her child (a baby Williams knew Westall believed was his) in a running car stopped in the middle of the street in front of a police vehicle with flashing lights. Yet when asked if she had been personally afraid of Westall at the time she jumped out, she responded "sort of. Well, not really, no. I mean, I don't know." *Id.,* at 117. Thus, while Williams could reasonably have stayed in the car until the policeman came up to her window or taken the more modest step of turning off the Mustang and removing its keys before seeking help, she instead chose a route that gave the reckless, agitated Westall a reason to flee and a means of doing so. A reasonable jury could conclude from these facts that Williams should have reasonably foreseen Westall's exit. It could also conclude that her excited "he's got my baby!" might well prompt-and could only be understood as intending to prompt-the officer's quick pursuit.

Williams claims, however, that the intervening criminal and negligent acts of Westall and law enforcement, respectively, insulate her from liability for any damages caused after she left the Mustang. The Court rejected this position in its April 4, 1996, Memorandum and Order denying Williams judgment on the pleadings, and it appears Williams can provide no reason to second guess that conclusion now.

■ Simply put, there are no intervening acts that could provide a liability fire-wall for Williams such that she is entitled to summary judgment. North Carolina courts have never declared that whenever a person leaves her keys in a car and that car is stolen the owner is absolved from all liability for whatever damages ensue. Instead, courts have held that if between a defendant's negligence and the subject injury there occurs a third party's intervening crime *that could not have been reasonably foreseen by the original torteasor,* "the causal chain between the original negligence and the accident is broken." *Williams v. Mickens,* 247 N.C. 262, 264, 100 S.E.2d 511, 513 (1957) (quoting *Ward v. Southern Ry. Co.,* 206 N.C. 530, 174 S.E. 443, 444 (1934)). Thus the question is whether Westall's intervening criminal acts—absconding with car and baby and fleeing the police—were reasonably foreseeable to Williams. See *Murrow v. Daniels,* 321 N.C. 494, 501, 364 S.E.2d 392, 397 (1988); *Purvis v. Bryson's Jewelers, Inc.,* 115 N.C.App. 146, 147, 443 S.E.2d 768, 769, *disc. rev. denied,* 338 N.C. 520, 452 S.E.2d 816 (1994); *Crinkley v. Holiday Inns,* 844 F.2d 156, 160 (4th Cir.1988). The standard for determining when an intervening *tortious* act (i.e., grossly negligent police pursuit) will absolve a negligent defendant is the same: "[w]hether the intervening act of a third person is the proximate cause of an injury and sufficient to excuse the defendant's lack of care depends on foreseeability." *Johnson v. Skinner,* 99 N.C.App. 1, 13, 392 S.E.2d 634, 641 (1990) (citing *Tyndall v. United States,* 295 F.Supp. 448, 452 (E.D.N.C.1969)).

■ The Court turns, then, to examine whether the acts of Westall and of law enforcement in this case are "of such nature and kind that the original wrongdoer had *no reasonable grounds to anticipate [them]." Adams v. Mills,* 312 N.C. 181, 194, 322 S.E.2d 164, 173 (1984) (emphasis added).

## 974

"The foreseeability standard should not be strictly applied. It is not necessary that the whole sequence of events be foreseen, only that some injury would occur." *Hester v. Miller*, 41 N.C.App. 509, 513, 255 S.E.2d 318, 320, *disc. rev. denied* 298 N.C. 296, 259 S.E.2d 913 (1979). "All that the plaintiff is required to prove on the question of foreseeability ... is that in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." *Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 234, 311 S.E.2d 559, 565 (1984) (citations omitted). Because "the question of intervening and concurring negligence is ... ordinarily for the jury ... [o]nly if the court is able to determine from the undisputed facts that the defendant's negligence was remote, and not a proximate cause of the injury, does the question become one of law for the court." *Hester*, 41 N.C.App. at 513, 255 S.E.2d at 320.[6]

It cannot be said with certainty that Williams had no reasonable grounds to anticipate Westall's flight: his erratic behavior, obvious recklessness in deploying the emergency break, violent threats, and agitation over looming jail-time all might lead a reasonable person to think he would do just that. The evidence suggests that Williams, had she been exercising reasonable care, may have foreseen that Westall would get behind the wheel of the idling car when she left the car and ran to the police.

 As a corollary matter, the policeman's pursuit could have been readily anticipated. Indeed, it is hard to imagine why Williams said the things she said to Deputy Snider if not to prompt the very pursuit she would now claim as unforeseen. Once Westall left and the officer gave chase, an unbroken chain of events led to the collision.[7] The issue of her negligence and whether the actions of others effectively intervened between it and the Plaintiff's injuries should thus be submitted to the jury. Summary

judgment on Williams' negligence will consequently be denied.

## B. Law Enforcement Motions for Summary Judgment

The two Defendant law enforcement agencies involved in the pursuit of Westall have moved for summary judgment on the basis that their actions in the chase did not constitute gross negligence. They also challenge Plaintiffs' ability to forecast evidence sufficient for trial on the issue of negligent employment and retention. The Court addresses these issues in turn.

### 1. Gross Negligence

 In determining the consequences of the Defendant officers' conduct, the Court must consider the import of N.C. Gen.Stat. § 20-145, which reads in pertinent part as follows:

> The speed limitations set forth in this Article shall not apply to vehicles when operated with due regard for safety under the direction of the police in the chase or apprehension of violators of the law or of persons charged with or suspected of any violation.... This exemption shall not, however, protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others.

See *Young v. Woodall*, 343 N.C. 459, 461, 471 S.E.2d 357, 359 (1996). "[T]he standard of care intended by the General Assembly involves the reckless disregard of the safety of others, which is gross negligence." *Id.*, at 462, 471 S.E.2d at 359. Accordingly, for the Plaintiff to prevail in this case, she must prove the officers' conduct constituted gross negligence, *Bullins v. Schmidt*, 322 N.C. 580, 369 S.E.2d 601 (1988), defined in the pursuit context as, "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Id.*, 322 N.C. at 583, 369 S.E.2d at 603. "A wanton act is one 'done of wicked purpose [sic] or when done needlessly, manifesting a reckless indifference to the rights of others.'" *Fowler v.*

---

6. "Proximate cause is an inference of fact to be drawn from other facts and circumstances." *Hairston*, 310 N.C. at 234, 311 S.E.2d at 565.

7. There may be more than one proximate cause of an injury. *Hairston* 310 N.C. at 234, 311 S.E.2d at 565; *Tyndall*, 295 F.Supp. at 452.

*N.C. Dept. of Crime Control & Public Safety,* 92 N.C.App. 733, 736, 376 S.E.2d 11, 13, *disc. rev. denied,* 324 N.C. 577, 381 S.E.2d 773 (1989) (citations omitted). According to Sheriff Haynes and the City, four leading cases examining gross negligence in the pursuit context firmly establish that the actions of law enforcement were not grossly negligent as a matter of law.

*Bullins v. Schmidt, supra,* first clarified that where a pursuit results in an accident not involving a law enforcement vehicle, a plaintiff must show that the pursuing agents acted with "gross negligence" to recover. The North Carolina Supreme Court found error in the trial courts submission of the negligence issue to a jury and held that judgment should have been entered for defendants because their actions constituted neither negligence nor gross negligence.[8]

In finding that the police had been neither negligent nor grossly negligent, the Supreme Court pointed out several critical factors weighing against the plaintiff "[t]here is no evidence in this case that the officers violated any of the rules of the road"; "[t]he pursued vehicles had out-of-state tags"; "[t]he driver was unknown to the officers and was acting as if he [were] under the influence of alcohol" (an especially important factor since "drunken drivers are a deadly menace to innocent persons" and officers "have a duty to remove them from the highways"); "[t]he pursuit was in the early morning hours along a predominantly rural section [of the highway] where traffic was light and the road was dry"; and finally, the officers "continuously used their emergency lights and sirens, kept their vehicles under proper control" and had no collisions. *Bullins,* 322 N.C. at 584–85, 369 S.E.2d at 604.

In *Fowler v. Dept. of Crime Control, supra* the North Carolina Court of Appeals affirmed the Industrial Commission's conclusion that a highway patrolman had not been grossly negligent in conducting a nighttime chase at over 100 m.p.h. which ended in a fatal collision between the suspect vehicle and an oncoming car.[9]

In *Clark v. Burke County,* 117 N.C.App. 85, 450 S.E.2d 747 (1994), the Court of Appeals upheld summary judgment in favor of law enforcement, noting that the subject 4 a.m. chase took place within city limits, covered only three miles of two-lane highway, lasted only a few minutes and took place under favorable weather.[10] The Deputy did not think the vehicle would stop, nor did he contemplate stopping the pursuit, nor did he pull alongside the vehicle or try to pass it or run it off the road.[11]

---

**8.** The *Bullins* chase began at 1:03 a.m. A Greensboro police officer saw a car with Florida plates weaving between two lanes on U.S. 220. When the first officer activated his lights, the subject kept moving at a normal speed; when a second agent attempted a rolling roadblock in front of him, the subject sped around, leading the two vehicles on a fourteen-minute, eighteen mile chase extending into adjoining Rockingham County at speeds up to 100 m.p.h. Several cars pulled off the side of the road to avoid collision. The suspect at times turned off his headlights and then caused a fatal head-on collision by passing in a no-passing zone. The officers kept in constant contact with various police agencies during the chase and received explicit direction from headquarters to continue the pursuit at their discretion.

**9.** While the court found the Trooper's following a vehicle for eight miles on a rural two-lane highway at such speeds without emergency equipment activated more egregious than the officers' actions in *Bullins,* it could find no error in the Commission's finding of no gross negligence given that the incident occurred around midnight in a sparsely populated area where only one other car (other than the one hit) was encountered.

**10.** The Deputy in *Clark* responded to an early morning call at an arcade; as he neared, a "hysterical" person approached him saying that a man was firing a weapon inside and another person told him that the gunman had entered a vehicle and was fleeing the scene. 117 N.C.App. at 87, 450 S.E.2d at 748. The Deputy "saw the vehicle pull out of the parking lot and, believing that a crime had been committed by one posing a threat to the public, pursued it." *Id.* As the chase progressed, the officer remained several car lengths behind the suspect, kept his emergency equipment activated at all times, made no effort to stop the vehicle (such as passing or roadblocking); and watched as the suspect lost control in a curve and crashed into an abutment. *Id.,* at 87–88, 450 S.E.2d at 748.

**11.** *Clark* dismissed the plaintiff's expert claims that the Sheriff and his department had been grossly negligent in training and supervising the Deputy who undertook the chase. As Defendant Haynes has pointed out, a finding that a Deputy agent was not grossly negligent in conducting a pursuit would appear to make moot claims that her principle was grossly negligent in training or retaining her therefor. Cf. *Temkin v. Frederick*

*Young v. Woodall, supra* is the North Carolina Supreme Courts most recent statement on the subject of pursuit liability. The *Young* decision found that the trial court erred by not granting the officer's summary judgment motion, and went on to hold the officer was not grossly negligent as a matter of law. 343 N.C. at 463, 471 S.E.2d at 360.[12] The Court found the officer's following of the suspect with no lights or siren activated, his entering the intersection with a yellow light flashing above, and his exceeding the speed limit "were acts of discretion . . . which may have been negligent but not grossly negligent." *Id.,* at 463, 471 S.E.2d at 360.

■ As previously indicated by review of the pertinent facts in a light most favorable to the nonmoving parties, they differ substantially from the facts in *Bullins, Fowler, Clark,* or *Young.* Moreover, this case involves what a jury could find to be departmental shortcomings *Bullins, Fowler, Clark,* and *Young* lacked, such as alleged improper training and pursuit policies.

These differences are critical to the gross negligence inquiry. *Bullins* observes that "[p]ublic policy requires officers in North Carolina to pursue and attempt to apprehend violators of the law," 322 N.C. at 584, 369 S.E.2d at 604, but public policy also requires officers not to engage in pursuit conduct with a conscious or reckless disregard for the rights and safety of others, *id.* at 583, 369 S.E.2d at 603.

The mistakes here, taken together, stand on a different order than those in the case law Defendants cite as supporting summary judgment. Sheriff Haynes has himself alleged that Marion's officers were negligent in the pursuit, Haynes' Answer to Plaintiff's

Amended Complaint, Fifth Defense, filed June 3, 1996, while The City of Marion has asserted that the Sheriffs officers were primarily negligent, Marion's Third–Party Complaint, filed April 19, 1995. An objective fact-finder could agree with both. Viewing the facts in a light most favorable to the Plaintiff, a reasonable jury could conclude that units of the McDowell County Sheriff's Department and units of the City of Marion Police Department pursued Westall in a manner demonstrating a "reckless disregard for the rights and safety of others." *Bullins,* 322 N.C. at 583, 369 S.E.2d at 603. Summary judgment, as a result, must be denied.

## 2. Negligent Employment and Retention

Counts Two and Five of the Plaintiff's Amended Complaint allege, respectively, that Marion and the Sheriff were grossly negligent in the hiring, retention, training and supervision of their officers engaged in the Westall pursuit.

■ At this stage in the lawsuit, the Plaintiff D'Alessandro's claims appear to have boiled down to the alleged negligent hiring and retention of Lt. Huskins by the City of Marion. In her opposition to summary judgment, Plaintiff claims the City should never have hired Huskins in the first place, and should have fired him once it did.

A claim for negligent hiring, supervision and retention is recognized in North Carolina when plaintiff proves: "(1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which the incompetency may be inferred; and (3) *either actual notice to*

County Com'rs, 945 F.2d 716, 724 (4th Cir.1991), cert. denied 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992) ("[a] claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised"). Consequently, the Clark discussion of negligent retention following its holding that the Deputy was not grossly negligent was dicta.

12. The *Young* chase began at approximately 2:00 a.m. on a May morning when a Winston–Salem police officer turned and followed a car that had

passed him with one headlight missing. The officer did not activate his blue lights immediately because he felt it would have prompted flight, but planned to turn them on upon drawing close. *Id.,* at 460, 471 S.E.2d at 358. He admitted he may have been exceeding the speed limit and a witness reported seeing him travelling at a high rate of speed immediately before the police vehicle entered a yellow-signalled intersection and crashed into an oncoming car taking a left across its path. Applicable police policy required that an officer activate his blue lights whenever driving above the speed limit.

*master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' ...; and (4) that the injury complained of resulted from the incompetency proved."*

Moricle v. Pilkington, 120 N.C.App. 383, 386, 462 S.E.2d 531, 533 (1995) (internal citations and quotations omitted) (emphasis in original; emphasis added as to (4)).

▮ The Plaintiff has presented two expert witnesses arguing that Marion was negligent and reckless in hiring and retaining Huskins. Alpert Report at 4, Cosgrove Report at 9, *attached as* Exhibits 1, 3 *to* Plaintiff's Opposition to Summary Judgment. According to the Plaintiff; Huskins' flaws were several: 1) he had been forced to resign from another police department prior to working for Marion; 2) was a known liar; 3) a thief; 4) an ineffective detective; 5) lazy; 6) often unavailable by radio to provide assistance; and 7) once subjected a citizen to "brutal treatment." Plaintiff's Opposition at 21. These flaws do not suggest Huskins to be a hypervigilant pursuer who will risk his life and the lives of others to apprehend a criminal; indeed, they suggest not enough law enforcement zeal, rather than too much.

Taken in its most favorable light, Plaintiff's evidence does not foretell Huskins' alleged incompetence in this case (i.e., trying to intercept a fugitive on foot without calling for support, mistakenly radioing that the driver was alone, pursuing the fleeing suspect without countermanding his own earlier order). Without proof of inherent unfitness or previous specific acts of negligence of a type from which the Sheriff could have inferred that Huskins would lead dangerous high-speed pursuits, this claim must fail.[13]

### V. ORDER

IT IS, THEREFORE, ORDERED that Third–Party Defendant/Fourth–Party Plaintiff Williams' Motion for Summary Judgment be **ALLOWED** on the claim for indemnity and **DENIED** on the claim for contribution;

IT IS FURTHER ORDERED that the summary judgment motion of Defendant and Third–Party Plaintiff City of Marion be **DENIED;** except that summary judgment is **ALLOWED** as to Plaintiff's claim for negligent employment and retention, and such claim is hereby **DISMISSED;** and

IT IS FURTHER ORDERED that the summary judgment motion of Defendants Haynes and United States Fidelity and Guarantee Company be **DENIED;** except that summary judgment is **ALLOWED** as to Plaintiff's claim for negligent employment and retention, and such claim is hereby **DISMISSED.**

---

13. Huskins had the same Basic law Enforcement Training in driving (which includes practice in pursuit and emergency driving) as the other officers involved in the chase, see Cosgrove Report, at 7–8, *attached as* Exhibit 3 to Plaintiff's Opposi-

tion, and no evidence has been presented as to reckless driving tendencies or pursuit fixation. Cf. *Clark*, 117 N.C.App. at 92, 450 S.E.2d at 750 (dicta) (listing unfounded allegations of negligent training and supervision).